Dennis H. HUGULEY, et al., Plaintiffs–Appellees,

v.

GENERAL MOTORS CORPORATION, Defendant–Appellant.

No. 94–1870.

United States Court of Appeals, Sixth Circuit.

Argued Sept. 11, 1995.

Decided Oct. 10, 1995.

Dennis D. James (argued and briefed), Reosti, James & Sirlin, Detroit, MI, for plaintiffs-appellees.

Daniel G. Galant, General Motors Corp., Office of the Gen. Counsel, Detroit, MI, Barbara B. Brown and Dennis L. Casey (briefed), Paul, Hastings, Janofsky & Walker, Washington, DC, Paul W. Crane, Jr. (argued), Hastings, Janofsky & Walker, Los Angeles, CA, for defendant-appellant.

Before: WELLFORD, MILBURN, and RYAN, Circuit Judges.

WELLFORD, J., delivered the opinion of the court, in which RYAN, J., joined. MILBURN, J. (pp. 136–137), delivered a separate dissenting opinion.

WELLFORD, Circuit Judge.

This is the most recent appeal arising from a consent decree entered in a large class action, employment discrimination case brought by African–American employees of General Motors Corporation ("GM").[1] The issue is whether the consent decree remains effective as to class members who work at a facility that GM sold to a third party. Applying the doctrine of successor liability, the district court held that the terms of the decree remained binding on GM and the purchaser of its facility. For the reasons stated herein, we **REVERSE**.

## I.

In July of 1983, plaintiffs, representing other similarly situated GM employees, filed a class action law suit, alleging racial discrimination with respect to promotions, demo-

---

1. In three previous appeals, several class members sought to avoid the claim preclusive effect of the consent decree by filing individual actions alleging post-decree discrimination. *See Huguley v. General Motors Corp. (Dunn),* 52 F.3d 1364 (6th Cir.1995); *Huguley v. General Motors Corp. (Perry II),* 35 F.3d 1052 (6th Cir.1994); *Huguley v. General Motors Corp. (Perry I),* 999 F.2d 142 (6th Cir.1993).

tions, layoffs, recalls, pay, transfers and other subjective personnel decisions in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e–7. The district court certified the class as including all African–American, salaried GM employees residing in Michigan, Ohio and Indiana who alleged employment discrimination on the basis of race. *Huguley v. General Motors Corp.*, 638 F.Supp. 1301 (E.D.Mich.1986). Prior to trial, the parties settled the dispute and submitted to the district court an elaborate consent decree. Because a substantial portion of the plaintiffs' proof rested on statistical claims of disparate treatment in employment evaluations between black and white employees, the decree provided extensive equitable relief for the incumbent class members, including a computer monitoring system ("Group Monitoring System"). The Group Monitoring System, which was to remain in effect for the five year life of the decree, required GM to record the number of promotions and discretionary salary increases awarded to black salaried employees during a given reporting period. If the number of promotions or salary increases awarded to non-black salaried employees exceeded the number granted to blacks by more than the standard deviation, the decree required GM to make up the difference during the next reporting period. The district court tentatively approved the decree in February of 1989, subject to a notice of the proposed settlement to individual class members. *See* 128 F.R.D. 81, 83 (E.D.Mich.1989), *aff'd*, 925 F.2d 1464 (6th Cir.), *cert. denied*, 502 U.S. 909, 112 S.Ct. 304, 116 L.Ed.2d 247 (1991). In March of 1989, several class members filed objections to the proposed settlement. *Id.* at 84. After a fairness hearing, the district court overruled the objections and approved the decree; a decision which this court subsequently affirmed. *Id.* at 88–89.

GM operated two plants in the vicinity of Indianapolis, Indiana, which were subject to the consent decree, the Allison Transmission Division and the Allison Gas Turbine Division. In June of 1993, GM sought a buyer for its Allison Transmission Division and the proposed sale raised concerns among some class members employed at the facility. Several class members sent an anonymous letter to the district court inquiring about the effect of the proposed sale on the decree. The letter raised five questions, two of which are relevant to this appeal:

1. In reference to the Huguley v. GM lawsuit, is Allison Transmission Division currently obligated under law to comply to all provisions mentioned in the Consent Decree?

2. Upon sale of our division from GM, will Allison Transmission Division still be obligated to the Five Year Consent Decree under new ownership?

On June 9, 1993, class counsel responded with respect to these issues:

1. Yes, per Decree Section III, A.

2. No, per Decree Section III, A.[2]

Shortly thereafter, counsel for GM wrote the district court and expressed her agreement that the decree would not apply should the sale be consummated. Her letter stated as follows:

1. Allison Transmission Division is currently obligated to comply with the Decree.

2. Under the Decree, a purchaser of a division or facility would not be obligated to comply with the Decree, which is predicated on analysis of the entire three-state salaried workforce.

GM never completed the sale of the Allison Transmission Division and the district judge made no finding regarding the questions raised in the anonymous letter.[3]

On December 1, 1993, however, GM did sell the Allison Gas Turbine Division ("Allison") to AEC Acquisition Company

---

**2.** Section III is the "definitions" section of the decree and paragraph A defines GM as "a Delaware corporation excluding subsidiaries, affiliates, partnerships or joint ventures. As used herein, the term [GM] includes the Corporation, its officers, directors, managers, employees, agents or attorneys."

**3.** There is a distinction between Allison Transmission Division, which was not sold, and Allison Gas Turbine Division, the one involved in this appeal.

("AEC").[4] Prior to the sale, GM employed approximately 1,950 salaried employees at Allison but only 186 of those employees were African–Americans. GM retained no ownership interest in, or control over, the Allison facility. AEC continued to employ virtually all of the salaried workers at Allison but retention of the employees was not a sale condition, nor did the agreement obligate AEC to continue any of GM's employment practices.

After the sale, GM's counsel contacted class counsel and sought an agreement that the Allison facility would no longer be subject to the terms of the decree. On this occasion, however, class counsel disagreed with GM's interpretation. Consequently, GM moved to clarify the meaning of the decree and asked the district court to confirm its interpretation. The district court granted the parties[5] an abbreviated discovery period and the opportunity to submit memoranda on the issue of successor liability. On June 27, 1994, the district court held that the decree remained effective as to the employees working at the Allison facility. In so holding, the district judge stated that the decree bound both GM and Allison and that GM was liable if Allison failed to comply with the decree. He noted that a mini-monitoring system, or something equivalent to it, could be established at Allison for the purpose of measuring Allison's compliance with the decree. This appeal ensued.

## II.

■ In *Huguley v. General Motors Corp. (Perry I)*, 999 F.2d 142, 146 (6th Cir.1993) (citation omitted), we stated that "a district court's interpretation of its consent decrees is entitled to substantial deference on appeal. Such deference is required because '[f]ew persons are in a better position to understand the meaning of a consent decree than the district judge who oversaw and approved

it.'" Plaintiffs cite *Perry I* for the proposition that this court reviews the district court's interpretation of the decree for clear error. GM also cites *Perry I* for the proposition that the district court's decision is reviewed *de novo*. And, indeed, *Perry I* stated that "we review *de novo* the district judge's legal determination" about the scope of the decree. *Id.* at 145.

■ The basic issue in this appeal is whether the parties intended—as evidenced by the consent decree—that GM and any third party who purchased a GM facility would remain obligated after the sale to provide the affirmative relief guaranteed by the settlement. This is a question of contract interpretation. *See United States v. ITT Continental Baking Co.*, 420 U.S. 223, 238, 95 S.Ct. 926, 935, 43 L.Ed.2d 148 (1975). This court has repeatedly held that "[t]he interpretation of a consent decree is a matter of law reviewed *de novo*."[6] *Stotts v. Memphis Fire Dep't*, 858 F.2d 289, 299 (6th Cir.1988). The other circuits also review consent decrees under the *de novo* standard. *E.g., Sinclair Oil Corp. v. Scherer*, 7 F.3d 191, 193 (10th Cir.1993); *United States v. Western Elec. Co.*, 900 F.2d 283, 293 (D.C.Cir.), *cert. denied*, 498 U.S. 911, 111 S.Ct. 283, 112 L.Ed.2d 238 (1990); *Kern Oil & Refining Co. v. Tenneco Oil Co.*, 840 F.2d 730, 736 (9th Cir.), *cert. denied*, 488 U.S. 948, 109 S.Ct. 378, 102 L.Ed.2d 367 (1988). Therefore, we review the district court's findings of fact for clear error, but the legal import of those findings must be assessed in light of the parties' contractual agreement, a matter which is entitled to plenary review. *Cf. NLRB v. Aquabrom, Div. of Great Lakes Chem. Corp.*, 855 F.2d 1174, 1180 (6th Cir.), *modified on other grounds*, 862 F.2d 100 (6th Cir.1988).

## III.

The Supreme Court first applied the doctrine of successor liability in *John Wiley &*

---

4. AEC is a holding company and the Allison facility operated under the corporate name of Allison Engine Company. On December 8, 1994, AEC sold Allison to Rolls–Royce, Inc.

5. The district court ordered that Allison be notified of the dispute, but Allison declined the opportunity to address the court.

6. In *Huguley v. General Motors Corp. (Dunn)*, 52 F.3d 1364, 1369–70 (6th Cir.1995), we attempted to resolve the apparent conflict in the language of *Perry I* regarding the standard of review.

*Sons, Inc. v. Livingston,* 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964), a National Labor Relations Act case. In order to effectuate the goals of federal labor policy, the Court held that a successor employer could be obligated to arbitrate under a collective bargaining agreement with the union of the predecessor employer even though the successor was not a party to the agreement. *Id.* at 549, 84 S.Ct. at 914. The Court explained that "[t]he objectives of national labor policy, reflected in established principles of federal law, require that the rightful prerogative of owners independently to rearrange their businesses and even eliminate themselves as employers be balanced by some protection to the employees from a sudden change in the employment relationship." *Id.* In *EEOC v. MacMillan Bloedel Containers, Inc.,* 503 F.2d 1086, 1090–91 (6th Cir.1974), we extended the rule of successor liability to remedies under Title VII. We concluded "that the considerations set forth by the Supreme Court . . . as justifying a successor doctrine to remedy unfair labor practices are applicable equally to remedy unfair employment practices in violation of Title VII." *Id.* at 1090.

█ In holding that successor liability applied in this case, the district judge held that "there is nothing inherent in either classwide relief or consent decrees that precludes me from ruling that Allison is bound by the Consent Decree under the doctrine of successorship liability." We have difficulty with the breadth of this statement. While there is nothing inherent about "class-wide" relief that would preclude application of the successorship doctrine, there is something inherent about "consent decrees" that *might* preclude application of successor liability in an appropriate case. A consent decree is a contractual agreement and, if the parties have agreed not to impose successor liability, the district court is not free to reform the contract to compensate one party for making a bad bargain. *See, e.g., Firefighters Local Union No. 1784 v. Stotts,* 467 U.S. 561, 574, 104 S.Ct. 2576, 2585, 81 L.Ed.2d 483 (1984); *United States v. Armour & Co.,* 402 U.S. 673, 681–82, 91 S.Ct. 1752, 1757–58, 29 L.Ed.2d 256 (1971). In fact, the Supreme Court acknowledged in *Livingston* that employees could waive successor liability. *Cf. Livingston,* 376 U.S. at 551, 84 S.Ct. at 915.

In support of his conclusion that there was nothing inherent about consent decrees that precluded successor liability, the district judge cited *Bates v. Pacific Maritime Association,* 744 F.2d 705 (9th Cir.1984). *Bates* is the only case we have found which discusses the applicability of the successorship doctrine to consent decrees, and it rejected the contention that successor liability could not be imposed with a consent decree. *Id.* at 709. The new employer argued against application of the successorship doctrine because, unlike a judgment, a consent decree does not involve a judicial finding of discrimination. *Id.* The *Bates* court disagreed, explaining that "[i]t is the enforceability of the consent decree obligation against [the successor employer] that is at issue, not the enforcement of some unresolved Title VII obligation." *Id.*

We agree with the Ninth Circuit that the absence of a judicial finding is not relevant to the application of the successorship doctrine. We find *Bates* distinguishable, however, because applying successor liability in the context of a consent decree necessarily raises the issue of contractual intent which is not at issue when there has been an actual judgment. *Bates* did not hold that the parties to a decree are unable, as a matter of public policy, to preclude the application of successor liability. Therefore, the initial inquiry is whether the decree precludes successor liability. If so, the district court cannot hold Allison liable; to do so would give plaintiffs more than the benefit of their bargain. If the decree allows for successorship liability or is silent on the question,[7] then the issue

---

7. At oral argument, GM's counsel suggested that, if the decree is silent as to the parties' intent, successor liability could not be imposed. The purpose of the successorship doctrine is to effectuate national labor policy by preventing a change of corporate structure or ownership from *automatically* depriving the predecessor's employees of hard won bargaining rights. *Livingston,* 376 U.S. at 549, 84 S.Ct. at 914. We have made clear that there is a presumption in favor of applying successor liability in Title VII cases. *MacMillan Bloedel Containers, Inc.,* 503 F.2d at 1091. Thus, absent some evidence that the parties affirmatively precluded successor liability,

becomes whether successor liability is appropriate on the facts of this case.

■ Plaintiffs contend that the parties intended the decree to bind purchasers of a GM facility such as Allison. Plaintiffs rely on Section V of the decree which states that "the agreements contained in [the Decree] shall continue to be effective and binding upon the parties and their agents and *successors* for a five-year period." Plaintiffs argue that Section V obligated GM to bind Allison to the terms of the decree.

GM reads the decree differently. It relies on paragraph D of Section VI which states that "[t]he Company is not required ... to keep any particular facility open or to maintain a particular level or type of activity at any facility." GM suggests that its sale of the Allison facility is the functional equivalent of a plant closing and that Section VI indicates that the parties did not intend for the decree to restrict GM's ordinary business decisions. GM also points to Section VII, paragraph C, which provides as follows:

> The Company's performance with respect to discretionary salary increases and promotion monitoring shall be measured on the basis of the increases or promotions made at all facilities covered by this Decree *without regard to whether or not individual facilities have exceeded, met, or not attained proportional discretionary salary increases or promotions.* Attainment of the desired mix of discretionary salary increases or promotions is predicated on the assumption that some facilities will exceed the goals established, some will meet them exactly, and others will fall short.

According to GM, the structure of the class-wide relief evidences the parties' intent that the court measure compliance as a whole, without regard to the performance of any one facility. GM adds that, when read in conjunction with Sections VI and VII, the successor provision only applies if a successor purchases all of GM's facilities covered by the decree, not when GM divests itself of individual facilities.

While the district judge agreed that the parties intended to measure compliance without regard to the performance of individual facilities, he believed that the parties did not contemplate that GM could exclude from the class-wide measurement a facility that continued to function within the three state region. In short, the district court rejected GM's plant closing analogy, stating, "[t]his analogy proves too much: any sale of a division or company can be fashioned as 'shutting down ... that particular division' and restarting the work under new owners. Accepting this argument would force me to reject the principle of successor liability altogether." Though he acknowledged the merit of GM's arguments, the district judge concluded that "imposing liability on Allison is the best way to effectuate the *goals* of the Consent Decree."

We believe that, under all the circumstances, the decree precludes successor liability for individual facilities. This is a close question because Section V expressly states that successors are bound under the decree. We find GM's plant closing analogy persuasive, however. Accepting GM's analogy does not require, as the district court suggests, that successor liability be rejected altogether. It only requires rejecting successor liability in this case, because we believe that is what the parties intended. The district court erred because it applied the successorship doctrine in order to effectuate what it considered to be the "goals" of the decree. Its task, however, was to ascertain the intent of the parties at the time of settlement. In *United States v. Armour & Co.*, 402 U.S. 673, 91 S.Ct. 1752, 29 L.Ed.2d 256 (1971), the Supreme Court explained that

> [c]onsent decrees are entered into by parties to a case after careful negotiation has produced agreement on their precise terms. The parties waive their right to litigate the issues involved in the case and thus save themselves the time, expense, and inevitable risk of litigation. Naturally, the agreement reached normally embodies a compromise; in exchange for the saving of cost and elimination of risk, the parties each give up something they might have

application of the doctrine in the individual case

will turn on the factors we listed in *MacMillan*.

won had they proceeded with the litigation. Thus the *decree* itself cannot be said to have a purpose; rather the *parties* have purposes, generally opposed to each other, and the resultant decree embodies as much of those opposing purposes as the respective parties have the bargaining power and skill to achieve. For these reasons, *the scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it.*

*Id.* at 681–82, 91 S.Ct. at 1757 (emphasis in original) (emphasis added) (footnote omitted). *See also Stotts,* 467 U.S. at 574, 104 S.Ct. at 2585–85; *Lorain NAACP v. Lorain Bd. of Educ.,* 979 F.2d 1141, 1148 (6th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 2998, 125 L.Ed.2d 691 (1993). As *Armour* indicates, the issue is not whether successor liability should be imposed to protect the plaintiffs or labor policy goals, but whether the parties intended to apply the Group Monitoring System to a single facility that GM sold to a third party.

Section VII makes clear that compliance with the decree should be measured without regard to the performance of individual facilities. This provision reflects GM's effort to resolve plaintiffs' claims on a class-wide basis and to avoid individual, divisional, or even state-wide remedies. Consequently, class members who work at a facility that fails to satisfy promotion or pay scale targets have no right to demand affirmative relief under the decree. So long as GM meets class-wide goals, the success or failure of an individual facility is irrelevant to whether GM has complied with the decree. Yet, the mini-monitoring system advocated by plaintiffs would allow class members at Allison to demand affirmative relief if Allison failed to satisfy targets established solely for that facility. We find this to be directly contrary to the intent of the parties as expressed in Section VII. The district court acknowledged that there "is force to this argument[,]" but concluded that the parties did not foresee that GM could exclude from class-wide compliance the performance of a facility sold to a third

party. The parties, however, agreed in Section VI that GM could close any facility covered by the decree, reduce the level of employment at any facility, or change the nature of the work performed at any facility. If GM could close a facility and remove that facility's performance from class-wide measurement, then we fail to see why it could not accomplish the same result by selling a facility to another employer. The district court feared that, if it adopted GM's reading of the decree, GM could divest itself of facilities that were below class-wide goals and, thereby, lower the number of promotions and pay increases that it would otherwise have been obligated to award to the remainder of the class. We believe this concern to be unfounded. No one contends that GM's sale was less than bona fide. It is highly unlikely that a company the size of GM would find the obligations of this decree so burdensome that it would sell off a productive facility simply for the purpose of evading the decree. Moreover, even if the district court's fears were well-founded, we still do not understand the distinction between a sale and a plant closing. The decree allowed GM to close a facility even if it failed to meet class-wide targets. Thus, plaintiffs were aware that GM could exclude individual facilities from class-wide measurement through the exercise of ordinary business decisions.[8]

When read in conjunction with the entire decree, especially Sections VI and VII, we believe the successor provision only applies if all of the facilities subject to the decree are sold to a third party. Furthermore, there is probative extrinsic evidence that resolves whatever latent ambiguity might remain. *E.g., William C. Roney & Co. v. Federal Ins. Co.,* 674 F.2d 587, 590 (6th Cir.1982) (applying Michigan law) (noting "that the manner in which the parties themselves have treated an executory contract that has uncertain or ambiguous terms is entitled to great weight"); *Pavlik v. Consolidation Coal Co.,* 456 F.2d 378, 381 (6th Cir.1972) ("Actions of the parties reflecting their subsequent construction of a contract may be looked at in

---

8. Our decision does not affect the rights of any claimant at the Allison facility to pursue the ordinary employment discrimination remedies

which may be available under Title VII and other civil rights statutes.

construing its purposes."). Class counsel stated, in his letter of June 9, 1993, that an adjacent Allison facility would not be subject to the decree if sold to a third party. This admission constitutes further evidence that the parties did not intend to establish monitoring systems for individual facilities.

We believe a fair reading of the decree precludes the imposition of successor liability on Allison. Therefore, we **REVERSE** the decision of the district court.

MILBURN, Circuit Judge, dissenting.

In their opinion, the majority accepts GM's argument that the sale of the Allison facility is the functional equivalent of a plant closing. Specifically, the majority states:

> We believe that, under all the circumstances, the decree precludes successor liability for individual facilities. This is a close question because Section V [of the consent decree] expressly states that successors are bound under the decree. We find GM's plant closing analogy persuasive, however.

Because I disagree with this conclusion, I respectfully dissent.

The majority ignores the critical distinction between a reduction in workforce or closure of one of GM's facilities and the action taken here. In this case, GM did not close or reduce the workforce at Allison Gas Turbine; it sold Allison as an ongoing business enterprise. Furthermore, from the evidence presented to the district court, Allison's purchaser, AEC, is operating the new company intact and along the same lines as GM operated Allison Gas Turbine. Although GM contends that "[f]or purposes of the decree, divestiture decisions are functionally equivalent to decisions to down-size or shut down a [GM] facility," Appellants' Brief at 12, a decision to close or down-size a facility does not give rise to an issue of successor liability. However, the sale of the facility as a continuing enterprise can lead to successor liability, a determination which is made based on factors independent of the "four corners" of the consent decree.

The majority also adopts GM's argument that because the consent decree was careful-

ly structured to provide prospective affirmative relief on a class-wide basis, the district court erred in applying the affirmative relief provisions of the consent decree to a single, divested facility such as AEC. Specifically, the majority has erroneously concluded that the district court intended to impose a mini-monitoring system at AEC. Although the district court engaged in a discussion of such a possibility, the district court did not impose any particular method of compliance with the consent decree on AEC or GM. Rather, it determined that AEC was liable under the consent decree as a successor to GM. In its June 28, 1994 opinion and order, the district court stated that it would "not decide the precise details of how [AEC] and GM should go about complying with ... the [c]onsent [d]ecree," but would "leave that for the parties and [AEC] to work out." J.A. 78. The district court also acknowledged that "[i]t may in fact turn out that imposing a mini-monitoring system on [AEC] is impractical." J.A. 78.

Furthermore, the district court did not err in imposing the affirmative relief requirements of the consent decree on a single facility such as AEC. In applying the factors set forth in *MacMillan Bloedel Containers, Inc.*, 503 F.2d 1086, 1094 (6th Cir.1974), to this case, the district court found that:

> There is no serious dispute in this case about *MacMillan* factors (3) through (9): [AEC] uses the same plant, the same work force, the same supervisory personnel, and the same machinery as the former Allison Gas Turbine Division. The first *MacMillan* factor—whether the successor had notice of the discrimination charge—also is not an issue in this case both because the discrimination charge and the Consent Decree are public knowledge and because the upper management of Allison Gas Turbine Division for the most part have continued as management under the new owners. This dispute therefore turns on whether GM or its successor Allison is able to provide adequate post-sale relief and whether imposition of liability is consistent with Allison's legitimate expectations and the interests of the plaintiff class.

J.A. 71–72. I agree.

Further,

two factors [notice and ability to provide relief] are critical to the imposition successor liability. The successor doctrine is derived from equitable principles, and it would be grossly unfair, except in the most exceptional circumstances, to impose successor liability on an innocent purchaser when the predecessor is fully capable of providing relief on when the successor did not have the opportunity to protect itself. . . .

*Musikiwamba v. ESSI, Inc.*, 760 F.2d 740, 750 (7th Cir.1985). "The primary concern [of successorship liability] . . . is to provide the discriminatee with full relief. Such relief may be awarded against the successor. On the other hand, the amenability of the predecessor to suit and its ability to provide relief will be a necessary inquiry." *MacMillan*, 503 F.2d at 1092.

The district court did not commit clear error in balancing the *MacMillan* factors. Factors one and three through nine are unquestionably satisfied. In addition, AEC is hardly an innocent purchaser; many of its management officials were also management officials at Allison Gas Turbine and had notice of the consent decree and its requirements. Thus, AEC had the opportunity to protect itself, as part of the purchase agreement with GM; AEC could have demanded an indemnification clause through which GM would agree to reimburse AEC for any costs it incurred in complying with the provisions of the consent decree. Further, there is no evidence in the record suggesting that AEC will be unable to afford relief to members of the plaintiff class who are now employed by AEC. As the district court noted, the exact form of this relief is unclear; it may be either a mini-monitoring system at AEC or some alternative form of relief negotiated by the parties and AEC.

However, the record casts doubt upon GM's ability to provide relief to members of the plaintiff class who are now employed by AEC. GM retains no ownership or any other interest in AEC, and the purchase agreement between GM and AEC does not obligate AEC to continue GM's salary structure, promotional schedule, or performance appraisal system. Thus, the *MacMillan* factors, particularly AEC's notice of the consent decree and its ability to afford relief to the members of the plaintiff class whom it now employs, weigh heavily in favor of the imposition of successorship liability under the consent decree on AEC.

Finally, GM argues "assuming, *arguendo,* that [the] Consent Decree obligations apply to [AEC], [GM] should not be liable for [AEC's] compliance [or noncompliance] with the remaining, affirmative obligations of the [Consent] Decree." Appellant's Brief at 17. I agree, and conclude that the district court erred in finding that GM remained liable if AEC were unable to comply with the prospective affirmative relief provisions of the consent decree.

Therefore, for the reasons stated, I would affirm the district court's judgment finding AEC to be a successor under the consent decree, and reverse the district court's judgment finding that GM remained liable if AEC were unable to comply with the prospective affirmative relief provisions of the consent decree.