*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
ELECTRONIC CITATION: 2001 FED App. 0392P (6th Cir.)
File Name: 01a0392p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

SAULT STE. MARIE TRIBE OF
CHIPPEWA INDIANS; GRAND
TRAVERSE BAND OF OTTAWA
AND CHIPPEWA INDIANS;
KEWEENAW BAY INDIAN
COMMUNITY; HANNAHVILLE
INDIAN COMMUNITY; BAY
MILLS INDIAN COMMUNITY,
    *Plaintiffs,*

LAC VIEUX DESERT BAND OF
LAKE SUPERIOR CHIPPEWA
INDIANS,
    *Plaintiff-Appellee,*

SAGINAW CHIPPEWA INDIAN
TRIBE OF MICHIGAN,
    *Intervening*
    *Plaintiff-Appellee,*

    *v.*

JOHN M. ENGLER, Governor,
    *Defendant-Appellant.*

No. 00-1277

1

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 90-00611—Douglas W. Hillman, District Judge.

Argued:  June 15, 2001

Decided and Filed:  November 7, 2001

Before:  MARTIN, Chief Judge; NELSON, Circuit Judge;
RICE, Chief District Judge.[*]

———————————

**COUNSEL**

**ARGUED:**    Keith  D.  Roberts,  OFFICE  OF  THE
ATTORNEY GENERAL OF MICHIGAN, LOTTERY AND
RACING  DIVISION,  Lansing,  Michigan,  for  Appellant.
Henry  M.  Buffalo,  Jr.,  JACOBSON,  BUFFALO,
SCHOESSLER & MAGNUSON, St. Paul, Minnesota, for
Appellees. **ON BRIEF:** Keith D. Roberts, OFFICE OF THE
ATTORNEY  GENERAL  OF  MICHIGAN,  Lansing,
Michigan, for Appellant.  Henry M. Buffalo, Steven G.
Thorne,  JACOBSON,  BUFFALO,  SCHOESSLER  &
MAGNUSON,  St.  Paul,  Minnesota,  Conly  J.  Schulte,
MONTEAU and PEEBLES, Omaha, Nebraska, Michael G.
Phelan,  SAGINAW  CHIPPEWA  INDIAN  TRIBE  OF
MICHIGAN,  LEGAL  DEPARTMENT,  Mt.  Pleasant,
Michigan, for Appellees.

———————————

**OPINION**

———————————

BOYCE F. MARTIN, JR., Chief Judge.  The plaintiffs in
this  case  are  seven  Indian  tribes  with  casinos  on  their

_____

[*] The  Honorable  Walter  Herbert  Rice,  Chief  United  States  District
Judge for the Southern District of Ohio, sitting by designation.

exclusivity by putting the two tribes where MGM Grand was on July 28. Therefore, February 18 brought the Seven Tribes' exclusivity to an end.

The New Tribes could not lawfully operate electronic games of chance until Michigan gave them permission to do so in the compacts. This of course required the compacts to take effect. Pursuant to their own plain terms, this happened on February 18. The parties do not dispute this conclusion. The compacts' only barrier to "permitting the initiation of any Class III gaming (which includes electronic games of chance, *see* 25 U.S.C. §§ 2703(7)(B)(ii) and 2703(8)) on eligible Indian lands," is enacting the ordinance. As we have pointed out, two of the New Tribes already had done so. Additionally, this was sufficient to comply with federal law, which allows Class III gaming if it is "(A) authorized by an ordinance or resolution . . . ; (B) located in a State that permits such gaming . . . and; (C) conducted in conformance with a Tribal-State compact . . . ." *Id*. § 2710(d)(1). Beginning February 18, the only thing prohibiting the two tribes we have identified from operating electronic games of chance was the tribes. We are satisfied that they thus possessed the right to do so as of that date.

In summary, *Sault Ste. Marie I* instructs that these two entities possessed the right to operate games of chance once they had satisfied all the contractual and legal prerequisites for offering those games to the public. Once another entity possessed that right, the Seven Tribes stopped owing Michigan the disputed payments. The district court correctly denied Governor Engler's motion.

Judgment AFFIRMED.

Michigan reservations. Under an agreement, they are required to pay the state of Michigan a sum of money representing revenue lost by the state before other casinos obtained the right to operate. The question presented is when the Seven Tribes stopped having exclusive casino operating rights.

Under slightly different circumstances, we have confronted this same question before. *See Sault Ste. Marie v. Engler*, 146 F.3d 367 (6th Cir. 1998) (*Sault Ste. Marie I*). Both disputes arose out of the Seven Tribes' even earlier suit against Governor Engler for failing to negotiate gaming compacts with them "in good faith," as required by federal law. The parties settled that 1990 case. The settlement provided that Michigan would enter into gaming compacts with the Seven Tribes. In exchange, the Seven Tribes agreed to make semi-annual payments of eight percent of the net win from their casinos' electronic games of chance, so long as the Seven Tribes collectively enjoyed the "exclusive right to operate" those types of games within the state. The district court entered a consent judgment to this effect on August 20, 1993. *Sault Ste. Marie I* decided when the exclusive right terminated in light of Michigan's 1996 legalization of casinos in downtown Detroit. We held then that the payments must continue until the state granted someone a license for a Detroit casino, regardless of when such a casino might ultimately open its doors. *See id*. at 373.

In the meantime, Michigan negotiated gaming compacts with four more Indian tribes, the Nottawaseppi Huron Band of Pottawatomi, the Little River Band of Ottawa Indians, the Pokagon Band of Pottawatomi, and the Little Traverse Bay Band of Odawa Indians. The Seven Tribes now claim that these compacts' effective date, February 18, 1999, ended their payment obligation a little more than five months before Michigan awarded MGM Grand the first Detroit license on July 28 of the same year. Moving to compel the Seven Tribes' compliance with the consent judgment, Governor Engler counters that these new compacts have no practical effect on what the Seven Tribes must pay. He stresses our prior statement that "the [Seven] Tribes maintain their

exclusive right until another group receives a casino license," *id*., and notes that none of the New Tribes actually licensed gaming on their reservations until after July 28 had passed. The district court denied Governor Engler's motion.

We agree with the district court that licenses per se do not bear upon this case. The licenses in *Sault Ste. Marie I* were dispositive because they officially conferred Michigan's permission to conduct gaming activities inside the state boundaries. This is not the function of the licenses involved in tribal gaming, which basically serve to (1) identify casino employees who have passed a background check, *see* 25 U.S.C. §§ 2710(b)(2)(F) and 2710(c)(1)-(2), and (2) identify each casino's geographic location, *see* 25 U.S.C. §§ 2710(d)(1)(A)(ii) and 2710(b). Furthermore, the tribal gaming licenses are issued by the New Tribes themselves, not by the state. Thus, the tribal gaming license requirements are comparable to the regulatory conditions state licensed casinos must meet after their licenses are issued. Governor Engler's equation of state licenses with tribal gaming licenses amounts to mere "linguistic slight-of-hand" and is not dispositive.

The district court correctly recognized that Governor Engler's motion compels another construction of the 1993 consent judgment. We do so de novo. *Huguley v. General Motors Corp.*, 67 F.3d 129, 132 (6th Cir. 1995). Consent judgments are binding contracts, subject to the ordinary rules of contractual interpretation. *Brown v. Neeb*, 644 F.2d 551, 557 (6th Cir. 1981). Because this contract was formed in Michigan, we interpret it under Michigan law. *Sawyer v. Arum*, 690 F.2d 590, 593 (6th Cir. 1982). "The primary goal in the construction or interpretation of any contract is to honor the intent of the parties." *Rasheed v. Chrysler Corp.*, 517 N.W.2d 19, 29 n. 28 (Mich. 1994). We "look for the intent of the parties in the words used in the instrument," *Michigan Chandelier Co. v. Morse*, 297 N.W. 64, 67 (Mich. 1941), and the key words we must examine remain "exclusive right to operate." However, the continuing enforcement of a consent judgment is rightfully considered an extension of the original lawsuit. Thus, to the extent that *Sault Ste. Marie I*'s

illumination of the phrase's meaning can apply here, we concur with the district court that it should be honored as the law of the case. *See Consolidation Coal Co. v. McMahon*, 77 F.3d 898, 905 (6th Cir. 1996).

We find it helpful to define "exclusive right to operate" using two distinct inquiries: First, what exactly is the *right* to operate? And second, when does an entity besides the Seven Tribes also have that right? *Sault Ste. Marie I* expressly addresses the second of these questions – the Seven Tribes' exclusivity ends when another group "possess[es], control[s], or use[s]" the right, *see Sault Ste. Marie I*, 146 F.3d at 372-73 – but answers the first with less precision. Nevertheless, we determined there that the Seven Tribes' exclusive right to operate electronic games of chance ended on the date that Michigan issued a license because, at that instant, another entity would possess the same right. Possession was enough. *See id*.

So what is the nature of a "right"? Lacking other legal authority, we turn to dictionary definitions of "right." *See* BLACK'S LAW DICTIONARY (7th ed. 1999) ("a power, privilege, or immunity secured to a person by law"); OXFORD ENGLISH DICTIONARY (2d ed. 1989) ("a justifiable claim, on legal or moral grounds, to have or obtain something, or to act in a certain way"). These definitions place both parties on an equal footing. Thus the Seven Tribes and the winning bidder in Detroit would find themselves on an equal footing. This case thus reduces to when one of the New Tribes can be said to have attained an equivalent position. We find that two of them, the Little River Band of Ottawa Indians and the Little Traverse Bay Band of Odawa Indians, attained it on February 18. We highlight that date for two reasons. First, these tribes' tribal-state compacts then became valid. Second, the tribes had also passed proper comprehensive gaming regulatory ordinances, which were approved by the chairman of the National Indian Gaming Commission, as the Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701–2721, requires. *See, e.g.*, 64 Fed. Reg. 4722, 4723 (Jan. 29, 1999). The February 18 aggregation of these two events ended the Seven Tribes'