**In the Matter of DMR FINANCIAL SERVICES, INC., Debtor.**

No. 01–52630–WS.

United States Bankruptcy Court,
E.D. Michigan,
Southern Division.

Jan. 28, 2002.

Wallace H. Handler, Sullivan, Ward, Bone, Tyler & Asher, P.C., Southfield, MI, for debtor.

Phillip J. Shefferly, Shefferly, Silverman & Morris, West Bloomfield, MI, for MVB Mortgage Corp.

## OPINION DENYING DEBTOR'S MOTION TO REJECT EXECUTORY CONTRACT

WALTER SHAPERO, Bankruptcy Judge.

### I. Introduction

Before ceasing operations in March, 2000, Debtor was in the business of servicing mortgages. Debtor's largest secured creditor was and continues to be Comerica Bank ("Comerica"). Debtor estimated that it owed its secured lenders approximately $25 million as of March, 2000, with Comerica retaining a perfected security interest in substantially all of Debtor's assets, including the servicing rights. Apparently, certain mortgagees had become dissatisfied with Debtor's work and were about to revoke Debtor's servicing rights. Comerica, on its own behalf and as the agent for the other secured lenders, sought to negotiate a deal to protect the security interests, and approached MVB Mortgage Corp. ("MVB") with a proposition whereby MVB, (a stranger to Debtor), was to offer to purchase certain servicing rights to the mortgages. MVB agreed and entered into an Agreement with Debtor on March 23, 2000. Thereafter, Debtor proceeded to liquidate its other assets outside of bankruptcy, and then filed a chapter 11 petition on June 29, 2001, to complete the liquidation. Debtor now seeks to reject the March 23, 2000 Agreement. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1334(a) and 157(a). This is a core proceeding under 28 U.S.C. § 157(b)(2)(A).

### II. The Terms of the Agreement

The Agreement is in the form of a letter from MVB, addressed to Debtor and Comerica, with "Mortgage Servicing Rights of [Debtor]" as the reference. The letter "confirm[ed MVB's] offer and intent to purchase the servicing rights of the [specified] portfolios ...." The Agreement covered four "servicing portfolios" for the Federal National Mortgage Association (FNMA), Federal Home Loan Mortgage Corp. (FHLMC), Government National Mortgage Association (GNMA) and Michigan State Housing Development Authority (MSHDA). The purchase price was one percent of the unpaid principal balance of all loans in the FNMA, FHLMC and GNMA portfolios, and one-half percent of the MSHDA portfolio loans, with some

exclusions. The Agreement defined the "Sale and Transfer date" as the date MVB "assume[d] the obligations to service the portfolio[s] in accordance with the terms of approvals or consents required of [FNMA, FHLMC, GNMA] and MSHDA and [became] entitled to all the rights and benefits of the Servicing." Seventy percent of the purchase price was due within three business days of the "Sale and Transfer date," with the balance due upon Debtor's delivery of the files to MVB. Although Comerica's lien attached to the proceeds of the sale, MVB was obligated to pay the purchase price directly to Comerica.

The Agreement also provided that MVB was "obligated to resell the servicing rights, except for the MSHDA portfolio, as soon as practicable." As of the hearing on Debtor's motion, MVB had not done so. Upon resale, MVB is to retain 20% of the net cash proceeds "as an administrative fee," plus the "one percent purchase price paid at Sale and Transfer date[,]" with the balance going to Comerica.[1] If and when all secured lenders are "paid in full, Comerica [will] have no further rights under [the] Agreement." Debtor was obligated to grant MVB the "Power of Attorney [to] execute any and all documents necessary to effectuate the terms and conditions of [the] Agreement, including but not limited to deeds, assignments, discharges, and all other documents as necessary to carry out the purposes and intent of [the] Agreement." Finally, the Agreement provided that Michigan law governs its construction.

MVB signed the Agreement as "Purchaser" and Debtor as "Seller." Comerica also signed, but only in acknowledgment. The purchase price was $4 million, which

MVB paid in full within days of the "Sale and Transfer date." Debtor transferred the mortgage files to MVB and executed the power of attorney. Although unclear from the Agreement, evidently MVB was obligated to pay net servicing fees over to Comerica, and, according to Debtor, continued to pay approximately $25,000 per month. Since ceasing operations, Debtor substantially reduced its secured debt, listing it at $464,000 in Schedule D. However, Comerica stated in its objection to Debtor's motion to use cash collateral that the secured debt totaled $501,419. Debtor asserts that Comerica and the other secured creditors will likely be paid in full without using the proceeds of MVB's eventual resale of the servicing rights, and thus will have no right to any of the proceeds. Debtor concludes that MVB erroneously believes it would then be entitled to 100% of the proceeds. Instead, Debtor argues that *Debtor* should receive not only the 80% that would have gone to the secured creditors, but also, if the Agreement is rejected, the 20% administrative fee due MVB, which Debtor would use to pay unsecured creditors. The Agreement does not specifically address this point. However, if indeed the secured creditors have been paid in full, the parties agree this determination is for another day.

### III. Debtor's Position

■ Before addressing the issue of whether the contract was executory, Debtor raised the argument that the Agreement is not a contract to sell, but rather Debtor employed MVB as broker and interim servicer of the mortgages. According to Debtor, MVB "acquir[ed] the servicing rights for a limited amount of time,

---

**1.** Evidently, the "one percent price paid" refers to the portion of the purchase price based on one percent of the unpaid principal balance of all loans in the FNMA, FHLMC and GNMA portfolios, but does not include the

MSHDA portfolio loans. The purchase price was based on one-half percent of the principal balances of the latter, the servicing rights of which MVB is not required to resell.

[and] also was to act as [Debtor]'s broker in selling said portfolio and obtain a 20% commission for such sale." (Debtor's Reply Br. at 1.) At oral argument, Debtor was unclear as to the extent of its property rights in the mortgages, implying initially that Debtor owned the mortgages themselves, and MVB's resale obligation included both the servicing rights as well as the paper. Debtor then backed down, stating that the sale of the mortgages was not involved. MVB countered Debtor owned only the servicing rights, which Debtor did not contradict.

■ "[U]nder Michigan law ... [t]he primary goal in the construction or interpretation of any contract is to honor the intent of the parties." *Sault Ste. Marie Tribe of Chippewa Indians v. Engler*, 271 F.3d 235, 238 (6th Cir.2001) (internal quotation marks and citation omitted). Courts should "look for the intent of the parties in the words used in the instrument . . . ." *Id.* (internal quotation marks and citation omitted). Even if a contract is "inartfully worded or clumsily arranged, [if it] fairly admits of but one interpretation[,] it may not be said to be ambiguous or, indeed, fatally unclear." *Raska v. Farm Bureau Mutual Insurance Co. of Michigan*, 412 Mich. 355, 314 N.W.2d 440, 441 (1982).

■ The contract at issue here, although somewhat poorly drafted, does not support Debtor's argument either that the subject matter included the mortgages themselves, or that MVB was acting as Debtor's broker. First, it does not appear that Debtor itself even owned the mortgages. Rather, it held only the servicing rights. Debtor retreated from its assertion that ownership of the mortgages was at issue, and did not rebut MVB's statement at oral argument that Debtor only owned the servicing rights, nor did Debtor pursue this argument in its post-hearing brief. Although the parties mentioned there were other related agreements, Debtor never contended there was any evidence that would sustain its claim of an ownership right in the mortgages. Further, even if Debtor in fact owned the mortgages, the Agreement clearly covers only the servicing rights. The Agreement consistently refers to the sale and purchase of "mortgage servicing rights." In addition, nothing in the Agreement supports a brokerage transaction. Michigan law defines "broker" as "an agent with special and limited authority, one who is employed by another to negotiate for specific property with the custody of which he has no concern." *Stephenson v. Golden*, 276 N.W. 849 (Mich.1937) (citations omitted). MVB's acting as Debtor's broker is inconsistent with the Agreement identifying MVB as the "purchaser." Thus, the Court concludes that the Agreement was a contract to sell the servicing rights. MVB's subsequent obligation to resell some of the servicing rights "as soon as practicable" does not impact the fact that Debtor sold its interests in those rights.

As to the central issue, Debtor argues the Agreement is executory. Debtor bases this argument on the premise that the "Countryman" definition of "executory contract" has been overruled in this Circuit, and the Court instead is bound to use the "functional" approach. Professor Vern Countryman defined "executory contract" as " 'a contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other.' " *Rieser v. Dayton Country Club Co. (In re Magness)*, 972 F.2d 689, 694 (6th Cir.1992) (quoting Vern Countryman, *Executory Contracts in Bankruptcy, Part I*, 57 Minn. L.Rev. 439, 460 (1973)). On the

other hand, the "functional approach" looks "backward from an examination of the purposes to be accomplished by rejection and, if they have already been accomplished, then the contract cannot be said to be executory." *Id.* (citing *In re Jolly*, 574 F.2d 349, 350–51 (6th Cir.1978)). Debtor interprets the functional approach as meaning if there is a benefit to be gained by rejection, the contract is executory. Applied to this Agreement, Debtor asserts there is a possibility it may receive at least part of the proceeds upon resale, which would be a benefit. Alternatively, Debtor argues it should have the right to resell the servicing rights, which would also provide a benefit to the estate. Therefore, Debtor concludes that the contract is executory. Finally, Debtor maintains the "Agreement is not profitable and produces no benefits to the Debtor[,]" and, with due deference to Debtor's business judgment, the Court should approve the rejection. (Debtor's Mot. at 1.)

## IV. MVB's Position

MVB contends the Agreement is not executory under either definition. Using the Countryman definition, MVB asserts (and Debtor agreed at the hearing), that Debtor's only performance due under the Agreement is to sign discharges. However, because MVB has power of attorney, it has signed all discharges and it is not necessary for Debtor to do so. Applying the Countryman test, MVB argues Debtor's failure to sign discharges, if called upon to do so, which is unlikely, would not be a material breach that would excuse the performance of MVB. In addition, MVB notes that its obligation to Debtor under the Agreement, i.e. to pay the purchase price within three days of the "Sale and Transfer date," was timely performed. MVB further argues that Debtor misinterprets and misapplies the functional approach, which also requires continuing obligations, of which Debtor has none. MVB

takes issue with Debtor's conclusion that only the functional test can be used in this Circuit. Finally, MVB believes Debtor is mistaken in assuming rejection of the Agreement would give Debtor the right to resell the servicing rights or to receive the proceeds. MVB characterizes this as recision instead of rejection.

## V. Discussion

■ The Court agrees with MVB that Debtor has misinterpreted the Sixth Circuit's definition of "executory contract," and misapplied the functional approach. The seminal Sixth Circuit case on the issue is *Chattanooga Memorial Park v. Still (In re Jolly)*, 574 F.2d 349 (6th Cir.1978). In this case, the debtor had contracted, pre-petition, to purchase four burial spaces in the plaintiff's cemetery, paying $40 as a down payment and promising to pay the balance of $688.80 in installments of $14.35. 574 F.2d at 349–50. The debtor defaulted on the payments, and the plaintiff sued, obtaining a default judgment due to the debtor's failure to appear. The debtor made some post-judgment payments, but then filed under Chapter XIII of the Bankruptcy Act. *Id.* at 350. The plaintiff filed a claim for the balance of the judgment. However, the trustee rejected the contract and disallowed the claim.

The Sixth Circuit explained that "rejections [of executory contracts] serve a dual purpose: they relieve the debtor of burdensome future obligations during the period that he is trying to recover financially, and they constitute a breach of the contract, making the other party to the contract a creditor with a claim . . . ." *Id.* The court noted the Countryman definition as being "frequently used" and

helpful, but [did] not resolve this problem. The key, it seems, to deciphering the meaning of the executory contract rejection provisions, is to work back-

ward, proceeding from an examination of the purposes rejection is expected to accomplish. If those objectives have already been accomplished, or if they can't be accomplished through rejection, then the contract is not executory within the meaning of the Bankruptcy Act.

*Id.* at 351. The court noted the most frequent application of rejection is with a long-term lease, where continued performance is clearly a burden. "At the same time, 'the holder of an executory contract with the debtor occupies an equivocal position. Until his contract is rejected, he is not a creditor with a provable claim.'" *Id.* at 351 (quoting *In re Greenpoint Metallic Bed Co.*, 113 F.2d 881, 883–84 (2d Cir. 1940)).

Thus, executory contracts involve obligations which continue into the future.... Generally, they are agreements which include an obligation for the debtor to do something in the future. In this case there is no obligation for the debtor to do anything in the future. His duty was in the past, he has breached that duty and had judgment entered against him for that breach.

*Id.* at 351 (citations omitted).

Thus, as to one of the purposes to be accomplished by rejection, the court found no "burdensome future obligations" from which the debtor could seek relief. Second, the court noted because the debtor breached the contract pre-petition, the plaintiff was an actual creditor. Therefore, "there is no need for the rejection procedures, which create a breach and make the other party a creditor. In this case, not only has there already been a breach, creating a claim, but the claim has already been reduced to a final judgment." *Id.* Therefore, working backward, the purposes to be accomplished had already been accomplished or were incapable of being accomplished through rejection. Thus, the contract was not executory.

Debtor argues the *Jolly* decision stands for the proposition that future performance obligations are irrelevant in determining whether a contract is executory. What Debtor fails to recognize is that *Jolly* encompasses the Countryman test by including the need for future obligations, the relief from which is one of the main purposes to be accomplished by rejection. Subsequent Sixth Circuit cases have clearly examined the debtor's future performance obligations as part of the executory analysis. In *Terrell v. Albaugh (In re Terrell)*, 892 F.2d 469 (6th Cir.1989), the debtors entered into a land contract five years pre-petition with the defendant to purchase farm land. 892 F.2d at 470. At the time of filing, the debtors still owed a substantial amount. The Sixth Circuit found the contract to be executory, noting that the legislative history indicated an intent "that Congress intended the term to be defined as a contract on which performance remains due to some extent on both sides." *Id.* at 471 (citing *Jolly*, 574 F.2d at 350–51) (quotation marks and other citations omitted). The court found the debtors had substantial performance due because there remained years of installment payments. *Id.* at 472. In addition, the defendant was required to convey title, and the failure to do so would be a material breach. *Id.* at 472–73 & n. 6; *see also Sloan v. Hicks (In re Becknell & Crace Coal Co.)*, 761 F.2d 319, 322 (6th Cir.1985) (finding agreement was executory by relying on *In re Jolly's* "work backward" method and concluding both parties "had obligations to perform in the future"); *Phar–Mor, Inc. v. Strouss Building Assoc.*, 204 B.R. 948, 952 n. 2, 953 (N.D.Ohio 1997) (disagreeing with appellants that *Terrell* rejected the functional test, and finding the functional test has two parts: whether the debtor had "material unful-

filled obligations extending into the future" and whether rejection of the partnership agreement might "reasonably benefit the estate"); *In re KMMCO, Inc.*, 40 B.R. 976, 978 (E.D.Mich.1984) (comparing *Jolly* and Countryman test and concluding: "This Court does not read the decision in *In re Jolly* to depart from this [Countryman's] well-settled definition."); *Huntington National Bank Co. v. Alix (In re Cardinal Industries, Inc.)*, 146 B.R. 720, 728 n. 7, 729 (Bankr.S.D.Ohio 1992) (noting "the functional approach of defining executory contracts is not entirely separate and distinct from the Countryman definition" and concluding "in determining whether or not an agreement is executory, a bankruptcy court, at least in this circuit, must consider the applicability of both the functional approach and the Countryman definition") (internal quotations and citations omitted).

Debtor also relies on the most recent Sixth Circuit decision on the issue, *Rieser v. Dayton Country Club Co. (In re Magness)*, 972 F.2d 689 (6th Cir.1992). The contract at issue was for golfing privileges as part of membership in a country club. 972 F.2d at 691. The number of golf memberships was limited, so the club had rules and regulations for allocating memberships. Club members paid substantial additional fees for golfing memberships, including increased monthly dues. A golfing member filed for bankruptcy under chapter 7. The issue was whether the trustee could assume and assign the debtor's golf membership rights. *Id.* The court noted that, in the *Jolly* decision, it found the Countryman definition to be "helpful but not controlling ...." *Id.* at 694 (citing *Jolly*, 574 F.2d at 351). It then characterized the *Jolly* decision as "suggest[ing] that in determining whether the contract is executory, we should work backwards from an examination of the purposes to be accomplished by rejection and, if they have already been accomplished,

then the contract cannot be said to be executory." *Id.* After reciting this paraphrase of the *Jolly* functional test, the court concluded it was "not necessary to further explore this executory contract problem" because the trustee sought to assume instead of reject the contract. Thus, the *Magness* court did not apply *any* test, but instead, earlier in the decision, adopted the district court's determination that the golf club membership was an executory contract. *Id.* at 693 (finding "that the decision of the district court was correct ... [because] the trustee had no power under § 365 of the Code to assign *this executory contract*") (emphasis added). The *Magness* decision, contrary to Debtor's assertion, does not bar the consideration of future performance obligations as a factor in determining whether a contract is executory. Instead, this inquiry in a necessary part of the analysis. The fact that Debtor may be a third party beneficiary upon MVB's resale of the servicing rights, if Comerica and other secured creditors have been paid in full, is insufficient to constitute substantial performance owed by MVB to Debtor. In this case, the Court concludes that neither Debtor nor MVB owed each other substantial future performance.

■ In addition to misinterpreting the *Magness* decision, Debtor misapplies the functional approach, applying circular reasoning. According to Debtor, if able to reject the Agreement, it could resell the servicing rights and keep 100% of the proceeds to pay creditors. This will benefit the estate and therefore the contract is executory and subject to rejection. In other words, Debtor first assumes the contract will be rejected, and then uses the anticipated benefit from rejection to find the contract executory and thus subject to rejection. However, the correct analysis is to first determine whether the Agreement

is executory, and then decide whether to assume or reject, whichever is more to Debtor's benefit. Debtor's focus on the end result of whether rejection will benefit the estate as the only factor in ascertaining the nature of the contract would mean all contracts where a debtor has *any* performance obligations would be executory because rejection would relieve the debtor of those obligations, which in turn would be a benefit to the estate. However, Debtor cannot weigh the benefit of rejection until it clears the executory bar, nor can Debtor use the expected benefit as the pole to vault that bar.

 Even if the Agreement was executory, Debtor misinterprets the effects of rejection. Debtor believes rejection will restore its ownership rights to the servicing rights, and consequently the ability to resell the rights. MVB correctly characterizes this as rescission. "Rescission [is] the cancellation of a contract and the return of the parties to the positions they would have occupied if the contract had not been made.... A fully executed contract cannot be rescinded." *Barron's Law Dictionary* 413–14 (3d ed.1991) (citations omitted). Debtor is attempting, through rejection, to regain what it has already sold, but without restoring the parties to the status quo ante. Instead of returning the purchase price, Debtor proposes leaving MVB holding a general unsecured claim for $4 million. Contrary to Debtor's argument, "rejection of an executory contract ... constitutes a *breach* of such contract ...." 11 U.S.C. § 365(g) (emphasis added). Moreover, rejection does not affect executed portions of an executory contract. *See Leasing Service Corp. v. First Tennessee Bank National Ass'n*, 826 F.2d 434, 437 (6th Cir.1987) (finding security interest granted as part of a lease was not affected upon rejection of the lease because it had fully vested and thus was non-

executory). In an analogous case, the debtor agreed to sell computer software and the associated copyright interests. *Rudaw/Empirical Software Products Ltd. v. Elgar Electronics Corp. (In re Rudaw/Empirical Software Products Ltd.)*, 83 B.R. 241, 243 (Bankr.S.D.N.Y.1988). About half of the purchase price was to be paid in installment payments. *Id.* at 243–44. Before all installments were made, the debtor filed a chapter 11 petition for relief. *Id.* at 244. After obtaining an order approving rejection of the agreement, the debtor sought the return of the software. *Id.* at 245. The court held that

> rejection of an executory contract is not the equivalent of rescission.... [R]ejection does not give the debtor the right to recover property sold and transferred to the other party.... [T]he debtor cannot undo an executed sale of property where title has passed. Such property does not revert to the debtor as a result of the debtor's rejection of an executory contract.

*Id.* at 245.

In the case before the Court, MVB became "entitled to all the rights and benefits of the Servicing" on the Sale and Transfer date. On that same date, MVB "assume[d] the obligations to service the portfolio[s] ...." Thus, on the Sale and Transfer date, ownership of the servicing rights became fixed in MVB, more than a year before Debtor filed its petition for relief. This sale cannot be undone through rejection of the Agreement.

Having sold the servicing rights, Debtor expected to regain them through rejection. Applying the functional approach, this objective cannot be accomplished by rejection. Furthermore, rejection will not relieve Debtor of any future obligations, burdensome, substantial or otherwise. Therefore, under both the Countryman test and the functional approach, the

Court finds the Agreement is not executory.

## VI. Conclusion

The Court concludes that Debtor's sale of the servicing rights to MVB under the Agreement was fully executed, and thus is not subject to rejection under § 365. Accordingly, the motion is DENIED. MVB shall present an order consistent with this opinion.