**GRAND TRAVERSE BAND OF OTTAWA AND CHIPPEWA INDIANS,**
Plaintiff/Counter–Defendant,

v.

**UNITED STATES ATTORNEY FOR THE WESTERN DISTRICT OF MICHIGAN,** Defendant/Counter–Plaintiff,

and

**State of Michigan, Intervenor.**

**Case No. 1:96–CV–466.**

United States District Court,
W.D. Michigan,
Southern Division.

April 22, 2002.

See also 46 F.Supp.2d 689.

Riyaz A. Kanji, William Rastetter, Olson & Bzdok, PC, Traverse City, MI, Kanji & Katzen, PLLC, Ann Arbor, MI, Daniel P. Rogan, Vernie C. Durocher, Dorsey & Whitney, Minneapolis, MN, John F. Petoskey, Suttons Bay, MI, for plaintiff.

Charles R. Gross, Assist. U.S. Atty., Grand Rapids, MI, for Office of Atty., Western Dist. of Michigan, defendant.

Keith D. Roberts, Assist. Atty. Gen., Lottery & Racing Com'n, Lansing, MI, for State of Michigan.

## OPINION

HILLMAN, Senior District Judge.

This is an action originally filed by the Grand Traverse Band of Ottawa and Chippewa Indians ("Grand Traverse Band" or "the Band") against the United States. The complaint seeks a declaratory judgment concerning the legality of the Class III gaming being conducted at Turtle Creek Casino, in Whitewater Township, by the Grand Traverse Band. The United States originally filed a counterclaim seeking to declare the Turtle Creek facility illegal, to enjoin further gaming at the facility, and to remove and confiscate gambling devices. That claim was subsequently withdrawn and a stipulation and order of dismissal entered dismissing all claims involving the United States. The State of Michigan also was allowed to intervene as party defendant and to file a complaint seeking to declare the operations illegal under the tribal-state compact and to enjoin gaming at Turtle Creek.

Following a bench trial and the filing of post-trial briefs, this matter is before the court for findings of fact and conclusions of law. For the reasons that follow, the court finds that the Turtle Creek site falls within the restored-lands exception of the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. § 2719(b)(1)(B)(iii), and is therefore legal. The court further finds that the State's claim under the tribal-state compact is without merit. Accordingly, judgment is granted to the plaintiff Band and against the State of Michigan.

## I. PROCEDURAL HISTORY

The Turtle Creek casino is located on land that is not part of or contiguous to lands held in trust for the Band on October 17, 1988. From the inception of this lawsuit, the United States and the intervenor State of Michigan contended that Turtle Creek is operating unlawfully because the IGRA, 25 U.S.C. § 2719, bars Class III gaming on lands taken into trust after October 17, 1988, unless that land meets one of the express exceptions of § 2719(a) or (b), all of which the governments contended are inapplicable here. As a result, the United States and the State of Michigan have asserted that, pursuant to IGRA, Class III gaming at Turtle Creek is barred absent compliance with the provisions of

§ 2719(b)(1)(A) requiring a determination by the Secretary, together with concurrence by the Governor of the State of Michigan, that the facility would be in the best interests of the tribe and its members and not be detrimental to the surrounding community. No such approvals were obtained by the Band.

At the time this action initially was filed, the complaint sought declaratory judgment on the basis of reasoning contained in a decision by Judge McKeague in *Keweenaw Bay Indian Community v. United States,* 914 F.Supp. 1496 (W.D.Mich.1996), *rev'd,* 136 F.3d 469 (6th Cir.1998), *cert. denied,* 525 U.S. 929, 119 S.Ct. 335, 142 L.Ed.2d 277 (1998), which reviewed the applicability of § 2719(b)(1) in parallel circumstances and determined that the requirements of § 2719 did not apply to situations in which a valid tribal-state compact had been reached pursuant to § 2710. The government promptly moved for summary judgment on the applicability of § 2719, contending that the *Keweenaw Bay* decision was wrongly decided. The Band moved for a stay of proceedings pending the outcome of the appeal in the *Keweenaw Bay* decision.

Upon review, this court stayed proceedings pending appeal of the *Keweenaw Bay* decision, which was subsequently reversed by the Sixth Circuit in 136 F.3d 469 (6th Cir.1998). The Keweenaw Bay tribe's petition for writ of certiorari was denied on October 13, 1998.

At the time the court granted the stay in 1996, the Grand Traverse Band advised the court that, if the Sixth Circuit reversed Judge McKeague, the Band intended to amend its complaint to include a claim that the Turtle Creek property was within one or more exceptions to § 2719, because the property was within the Band's 1836 treaty lands. The Band indicated, however, that unless the *Keweenaw Bay* issue was overturned on appeal, it preferred not to invest the resources that would be required to prove the historical claim inasmuch as the legal issue would be moot. Following the Sixth Circuit's reversal of Judge McKeague's decision in *Keweenaw Bay,* this court held a status conference. The Band again expressed its intent to file an amended complaint, which the court allowed.

In its first amended complaint, the Band asserted that the land on which Turtle Creek is situated is part of the Band's historical reservation, and thus outside the proscriptions of § 2719 because the land is "within or contiguous to the boundaries of the reservation of the Indian tribe on October 17, 1988," as provided in § 2719(a)(1).

This matter previously was before the court on a motion for preliminary injunction filed by the United States and a motion to continue a stay of proceedings filed by the Band. In response to the motion for preliminary injunction, the Band asserted that the land on which Turtle Creek lies was taken into trust as part of "the initial reservation of an Indian tribe acknowledged by the Secretary under the Federal acknowledgment process ...," as provided in § 2719(b)(1)(B)(ii), and that the Turtle Creek land was taken into trust as part of "the restoration of lands for an Indian tribe that is restored to Federal recognition ...," as provided in § 2719(a)(2)(B)(iii) (the "restored-lands exception").

The court denied the government's motion for preliminary injunction finding that the government had failed to demonstrate likelihood of success on at least the restored-land exception. The court granted the Band's motion for further stay in order to permit the National Indian Gaming Commission ("NIGC") to first consider whether the Turtle Creek Casino fell within one of the exceptions of the IGRA.

During the pendency of the NIGC proceedings, plaintiff's expert joined the expert of the United States in concluding that the land was not contiguous to or within the last recognized reservation of the Band, and therefore not within the exception under § 2719(a)(1).

On August 31, 2001, the NIGC reached a determination that the Turtle Creek site fell within the restored-lands exception to the IGRA. (P–23.) The NIGC informed this court of its decision, in which the Department of the Interior concurred. (P–23.)

Following issuance of the NIGC determination, the stay in this case was lifted and, following discovery, the case proceeded to a bench trial held in January 2002. Shortly before trial, the United States withdrew from the litigation and dropped its counterclaim, joining its agencies, the NIGC and the Department of the Interior, in the interpretation of the restored-lands exception. At the same time, the court permitted the Band to amend its complaint for the second time, so as to conform the pleadings with those issues which were actually litigated between the parties since 1998 and remained for trial, specifically, the restored-lands exception and the State's compact claim.

## II.  *FINDINGS OF FACT*

The Grand Traverse Band is a federally recognized Indian tribe presently maintaining a government-to-government relationship with the United States. (Uncont. Fact N. 1.) The Band previously maintained a government-to-government relationship with the United States from 1795 until 1872, and is a successor to a series of treaties with the United States in 1795, 1815, 1836 and 1855. (Uncont. Fact. No. 2; P–1; P–2; P–3; P–5.)

In 1872, then-Secretary of the Interior, Columbus Delano, improperly severed the government-to-government relationship between the Band and the United States, ceasing to treat the Band as a federally recognized tribe. (Uncont. Fact N. 4; P–7; P–25 at 7–8; Tr. I McClurcken 41–43.) Following termination of the relationship, the Band experienced increasing poverty, loss of land base and depletion of the resources of its community. (Tr. I Chambers 71–72, 77–78; Tr. I Burtt 94–98; Tr. I Kewaygoshkum 121–22; Tr. III Petoskey 105–106; Tr. I Connolly 117–118.)

Between 1872 and 1980, the Band continually sought to regain its status as a federally recognized tribe. The Band's efforts succeeded in 1980 when it became the first tribe acknowledged by the Secretary of the Interior pursuant to the federal acknowledgment process, 25 C.F.R. Part 54 (now 25 C.F.R. Part 83). (Uncont. Fact No. 5; P–25 at 8–10; P–8; P–17 through P–19; Tr. I Chambers 72–83.) On January 17, 1984, the Department of the Interior declared a single 12.5 acre parcel as the initial reservation of the Band. 49 Fed.Reg.2025 (Jan. 17, 1984).

The Band has a six-county service area in the Western District of Michigan, encompassing Antrim, Benzie, Charlevoix, Grand Traverse, Leelanau and Manistee Counties. (Uncont.Fact. No. 6.)

The history of the Band's original recognition, executive termination and later re-recognition is essentially parallel to that of the Pokogon Band of Potawatomi Indians, the Little Traverse Bay Bands of Odawa Indians, and the Little River Band of Ottawa Indians. All three tribes were parties to the same series of treaties and the same termination by Secretary Delano in 1872. (P–20; P–21; P–22.)

Between 1980 and 1988, the Band engaged in a protracted dispute with the Department of the Interior over the terms of its constitution. During this period, the Secretary of the Interior refused to take further land into trust for the Band. (Tr. I

Burtt 108–112.) In March 1988, after the dispute was resolved, the Secretary ratified the Band's Constitution. (P–24.)

Thereafter, between March 1988 and July 1990, the Band engaged in significant efforts to acquire land. The United States took into trust multiple parcels of property that continue to constitute the majority of its trust lands. (Tr. II Kewaygoshkum 8–9; Dkt # 64: Rastetter aff. ¶ 9.)

On April 20, 1989, the Band acquired title to a parcel of land in Whitewater Township, Grand Traverse County, Michigan, that is commonly referred to as the "Turtle Creek" site. (Uncont. Fact No. 8.) The site is legally described as follows:

> That part of the West ½ of the Southeast 1/4 lying South of the Railroad Right of Way, Section 32, Town 28 North, Range 9 West.

The site was placed into trust on August 8, 1989. (Uncont. Fact No. 9; P–24.) The trust application for the Turtle Creek site did not indicate that it was being acquired for gaming purposes, though it did specify that it may be used for future economic development. (Tr. II Kewaygoshkum 19–20; Tr. II Petoskey 27–30; P–24.)

The Turtle Creek site is located within the lands ceded by the Band to the United States by the Treaty of 1836, and from 1861 until its purchase by the Band on April 20, 1989, it was privately owned. (Uncont. Fact No. 8; P–24; P–25 at 45–46.) Although 1.5 miles outside the 1836 treaty reservation, evidence suggests that the site was located within the contemplated reservation, which was not designated for four years after the treaty was signed. (P–25 30–31, 34–39; P–42; P–43; P–44; Tr. I McClurken 63–65.)

The land, located on the east shore of Grand Traverse Bay, is at the heart of the region that comprised the core of the Band's aboriginal territory and was historically important to the economy and culture of the Band. (P–25 at 10–11, 66–67;

Tr. I McClurcken 48, 60.) According to archaeological investigations, the east shore of Grand Traverse Bay has been occupied by indigenous peoples for thousands of years. (P–25 at 16–17.) The Band itself has occupied the region continuously from at least 100 years before treaty times until the present. (P–25 at 2.) The site is at the heart of a region providing a range of important natural resources for food, shelter, tools and medicine. (P–25 at 3, 14–15, 22–25; Tr. I McClurken 50–52.) The region also was traversed by a network of trails extending along the shore of Grand Traverse Bay and connecting to major routes to Saginaw and Cadillac that in turn connected with trails spreading across the continent. (P–31; P–32; P–33; P–25 at 17–18; Tr. I McClurken 56–57.) In the late nineteenth century, Band members continued to reside on the east shore of Grand Traverse Bay and sought title to land in order to remain in the region. (P–59; P–25 at 49–56, 67; Tr. I McClurken 62–63.)

Similarly, in the twentieth century, Band members continued to live on the east shore and maintained an economic, spiritual and cultural connection to the area. (P–25 at 57–62, 67; Tr. II Petoskey 22–24; Tr. I Chambers 74–75; Tr. I McClurken 62–63.) Acquisition of the Turtle Creek site was important for the Band to maintain a connection to the east shore region and to provide services and economic development to its members located on the east shore. (Tr. II Petoskey 30.)

In August 1993, the Grand Traverse Band entered into a tribal-state gaming compact with the State of Michigan pursuant to the IGRA, 25 U.S.C. § 2710, for Class III (casino-style) gambling on reservation lands. The compact is virtually identical to those signed between the State and six other Indian tribes on the same day. (Uncont. Fact No. 10; J–5; P–87;

Tr. III Gadola 45.) The compact was approved under the procedures of the IGRA by the United States Department of the Interior. The Michigan House of Representatives and the Michigan Senate approved the compacts by concurrent resolution on September 21, 1993 and September 30, 1993, respectively. (Uncont. Fact No. 11.) The compacts became effective on November 30, 1993, when the Secretary of the Interior published his approval of the compacts in the Federal Register. (Uncont. Fact No. 12; 58 Fed.Reg. 63,262 (1993).)

Section 2(C) of the compact provides that, "[n]otwithstanding subsection 2(B) above, any lands which the Tribe proposes to be taken into trust by the United States for purposes of locating a gaming establishment thereon shall be subject to the Governor's concurrence power, pursuant to 25 U.S.C. § 2719 or any successor provision of law." (J-5 § 2(C).) It was undisputed at trial that, at the time of negotiations, the parties understood that under § 2719 of IGRA, the Governor's concurrence is required for gaming by tribes on newly acquired lands in some circumstances, see 25 U.S.C. § 2719(b)(1)(A), but not under other circumstances, see, e.g., 25 U.S.C. §§ 2719(a)(1) and 2719(b)(1)(B). (Tr. III Gadola 29–30; Tr. III Peebles 70–71; Greene Dep. at 21–22.) It was further undisputed at trial that the parties added section 2(C) to the compact in order to make clear that the Governor retained his powers under § 2719, but that no party intended to enlarge those powers. (Tr. III Gadola 33–34, 43–44, 46; Greene dep. at 31–32, 110, 116; Tr. III Peebles 71, 73, 79; Tr. III Petoskey 100; P–87; P–88; P–90; P–91; P–93; P–95; P–96.)

At the time the tribal-state compact was negotiated, the Band derived important revenues and employment opportunities from its gaming operations at the Leelanau Sands Casino in Peshawbestown.

(Uncont. Fact Nos. 7, 17.) The Band, however, continued to have significant unmet economic and noneconomic needs. (Tr. III Petoskey 83–86.)

On June 13, 1994, the National Indian Gaming Commission approved the Band's Gaming Code pursuant to 25 C.F.R. §§ 522.6 and 522.8. (Uncont. Fact No. 13.) In accordance with the Band's Gaming Code, the Grand Traverse Band Gaming Commission issued a license authorizing casino-style gaming at the Turtle Creek site. (P–81.) The Band opened its Turtle Creek Casino on June 14, 1996. (Uncont. Fact No. 20; P–81.)

In fiscal year 2001, Turtle Creek provided approximately 89% of the Band's gaming revenue. (Tr. II Kewaygoshkum 10.) The casino now employs approximately 500 persons, approximately half of whom are tribal members. (Tr. II Kewaygoshkum 15.) Revenues from the Turtle Creek Casino also fund approximately 270 additional tribal government positions, which administer a variety of governmental programs, including health care, elder care, child care, youth services, education, housing, economic development and law enforcement. (Uncont. Fact No. 19; Tr. II Kewaygoshkum 10, 15.) The casino also provides some of the best employment opportunities in the region, and all of its employees are eligible for health insurance benefits, disability benefits and 401(k) benefit plans. (Tr. II Kewaygoshkum 16.) The casino also provides revenues to regional governmental entities and provides significant side benefits to the local tourist economy. (Tr. II Kewaygoshkum 17.)

## III. CONCLUSIONS OF LAW

### A. Restored Lands Exception

Sections 2719(a) and (b)(1) state in relevant part as follows:

**(a) Prohibition on lands acquired in trust by Secretary**

Except as provided in subsection (b) of this section, gaming regulated by this chapter shall not be conducted on lands acquired by the Secretary in trust for the benefit of the Indian tribe after October 17, 1988, unless—

(1) such lands are located within or contiguous to the boundaries of the reservation of the Indian tribe on October 17, 1988;

\* \* \* \* \* \*

**(b) Exceptions**

(1) Subsection (a) of this section will not apply when—

(A) the Secretary, after consultation with the Indian tribe and appropriate State, and local officials, including officials of other nearby Indian tribes, determines that a gaming establishment on newly acquired lands would be in the best interest of the Indian tribe and its members, and would not be detrimental to the surrounding community, but only if the Governor of the State in which the gaming activity is to be conducted concurs in the Secretary's determination; or

(B) land are taken in to trust as part of—

(i) a settlement of a land claim,

(ii) the initial reservation of an Indian tribe acknowledged by the Secretary under the Federal acknowledgment process, or

(iii) the restoration of lands for an Indian tribe that is restored to Federal recognition.

25 U.S.C. §§ 2719(a)(1), (b)(1).

Under the quoted terms of 25 U.S.C. § 2719(a), gaming is prohibited on lands acquired by the Secretary in trust for the benefit of an Indian tribe after October 17, 1988, unless the land in question falls within one of the exceptions of § 2719. The Turtle Creek site was taken into trust on August 8, 1989, after the effective date of the IGRA. The question before the court is whether gaming at the Turtle Creek property is nevertheless legal because the land was "taken into trust as part of ... the restoration of lands for an Indian tribe that is restored to federal recognition." 25 U.S.C. § 2719(b)(1)(B)(iii).

The court previously addressed this question in its 1999 opinion, in which it denied the motion of the United States for preliminary injunction. Since that opinion was issued, the court's general reasoning has been applied by at least three other district courts and has been adopted by the NIGC and the Department of the Interior. *See Confederated Tribes of Coos, Lower Umpqua & Siuslaw Indians v. Babbitt,* 116 F.Supp.2d 155, 163–64 (D.D.C. 2000); *Sault Ste. Marie Tribe of Lake Superior v. United States,* 78 F.Supp.2d 699, 706 (W.D.Mich.1999); *TOMAC v. Norton,* 193 F.Supp.2d 182, 193–94 (D.D.C. 2002); (P–23: Letter from General Counsel of NIGC to Hillman, J.) No contrary authority exists.

■ As NIGC noted in its letter opinion to this court, and as the parties agree, because the NIGC did not employ formal adjudicatory procedures, the NIGC's determination is not entitled to the level of deference set forth in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) (in appropriate circumstances, agency determination is binding unless procedurally defective, arbitrary or capricious in substance, or manifestly contrary to statute). Nevertheless, " 'the well reasoned views of the agencies implementing a statute "constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." ' " *United States v. Mead*

*Corp.,* 533 U.S. 218, 227, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001) (quoting *Bragdon v, Abbott,* 524 U.S. 624, 642, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998) (quoting *Skidmore v. Swift & Co.,* 323 U.S. 134, 139–40, 65 S.Ct. 161, 89 L.Ed. 124 (1944))). As a consequence, this court must give such deference to the NIGC as is appropriate in light of the thoroughness, reasoning and consistency of its determination. *Id.* at 2172, 2175.

Applying this standard, the court is persuaded that the determination of the NIGC regarding the restored-lands exception is entitled to substantial weight. In light of the weight of court authority and the agency determination, the court finds no reasonable basis for altering its conclusion that the Band is a restored tribe within the meaning of the IGRA.

### 1. Whether the Band is a "restored" tribe.

As the court reasoned in 1999, in order to determine whether the Band meets the restoration exception under § 2719(b)(1)(B)(iii), the court must first determine whether the Band is a "restored" tribe within the meaning of the provision, and second, whether the land was taken into trust as part of a "restoration" of lands to such restored tribe. Neither "restored" nor "restoration" is defined under § 2719(b)(1)(B)(iii). *See Sault Ste. Marie,* 78 F.Supp.2d at 706; *Grand Traverse Band,* 46 F.Supp.2d at 696. As a result, this court must apply ordinary principles of statutory construction to determine the meaning of the words. *Williams v. Taylor,* 529 U.S. 420, 431–32, 120 S.Ct. 1479, 146 L.Ed.2d 435 (2000). *See also American Tobacco Co. v. Patterson,* 456 U.S. 63, 68, 102 S.Ct. 1534, 71 L.Ed.2d 748 (1982).

██ Interpretation of a statute begins with the plain meaning of the language itself. *See Nixon v. Kent County,* 76 F.3d 1381, 1386 (6th Cir.1996). The court must "give the words of a statute their ordinary, contemporary, common meaning, absent an indication Congress intended them to bear some different import." *Williams,* 529 U.S. at 431–32, 120 S.Ct. 1479 (referring to dictionary definitions to determine meaning of statutory term); *see also Patterson,* 456 U.S. at 68, 102 S.Ct. 1534 ("[W]e assume that the legislative purpose is expressed by the ordinary meaning of the words used. Thus absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive."). *See also Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.,* 530 U.S. 1, 6, 120 S.Ct. 1942, 147 L.Ed.2d 1 (2000) ("[W]e begin with the understanding that Congress says in a statute what it means and means what it says there ... [W]hen the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms.") (internal quotations and citations omitted).

The dictionary provides the following principal definitions of "restore":

**1:** to give back (as something lost or taken away): make restitution of: return .... **2:** to put or bring back (as into existence or use). .... **3:** to bring back or put back into a former or original state....

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY, p.1936 (G. & C. Merriam Co.1976). Similarly, the entry for "restoration" contains the following principal definition:

**1:** an act of restoring or the condition or fact of being restored: as **a:** bringing back to or putting back into a former position or condition: reinstatement, renewal, reestablishment....

*Id.*

It is undisputed that the Band was recognized by the United States for the pur-

pose of signing a series of treaties between 1795 and 1855. These treaties granted the Band reservation lands and other compensation, and the Band continued to have government-to-government relationship with the United States until 1876. At that time, the Secretary of the Interior improperly terminated the federal trust relationship by administrative action. The Band unsuccessfully attempted for over a century to re-obtain federal recognition. Finally, in 1980, a formal administrative acknowledgment procedure was implemented, and the Band was the first tribe to exercise that procedure.

The State of Michigan does not dispute the chronology of historical treatment of the Band. It contends, however, that the terms "restored" and "restoration" have an explicit meaning under the structure of the statute, even if that meaning is not set forth in a dictionary definition or express statutory definition. The State reasons that the statute contains a separate exception in § 2719(b)(1)(B)(ii) for lands obtained by a tribe when it is "acknowledged" by the Secretary of the Interior through the federal acknowledgment process under 25 C.F.R. Part 83. The State therefore argues that by the "plain meaning" of the statute construed as a whole, an "acknowledged" tribe under § 2719(b)(1)(B)(ii) may never be considered "restored" under § 2719(b)(1)(B)(iii). The State argues that in order to give separate meaning to the two exceptions for "acknowledged" and "restored" tribes, the concept of "restoration" of an Indian tribe under § 2719(b)(1)(B)(iii) must apply only to a process of restoration by way of Congressional action, not by agency acknowledgment. Because the Band uncontestedly was acknowledged by the Secretary under subsection (B)(ii), the State argues that it may not be considered restored under subsection (B)(iii).

Alternatively, the State argues for the first time in its post trial brief that a tribe may only be considered to be restored when its recognition was legislatively, rather than administratively, terminated. In support of this argument, the State does no more than point to a number of tribes whose recognition was legislatively terminated and subsequently legislatively restored.[1]

Thus, the State does not dispute the ordinary meaning of the words "restore" and "restoration." Instead, it asserts that the structure of the statute requires that the dictionary definition be narrowed to include only situations in which "termination" and later "restoration" have been performed by Congress.

■ An exception to the maxim that words be given their ordinary meaning exists "[w]here words conflict with each other, where the different clauses of an instrument bear upon each other, and would be inconsistent unless the natural and common import of words be varied...." *Sturges v. Crowninshield,* 17 U.S. 122, 202, 4 Wheat. 122, 4 L.Ed. 529 (1819), *quoted in Lyons v. Ohio Adult Parole Auth.,* 105 F.3d 1063, 1069 (6th Cir.1997). The State contends that unless the term is given a specialized meaning, the restored

---

1. The court notes that the State's argument concerning the requirement of legislative termination is even more tenuous, inasmuch as the IGRA does not itself use the word "termination" to describe the exception. Instead, the State suggests that congressional use of the word "restore" and "restoration" depends on not only a proprietary meaning of those terms, but also suggests that Congress intend-

ed to incorporate a proprietary way in which the later-restored recognition was taken away. The State has not even attempted to offer evidence supporting such a labyrinthine congressional intent. *See TOMAC,* 2002 WL 500868, at * 8 (rejecting argument that only tribes that had been legislatively terminated could be considered "restored" under the IGRA).

lands exception will swallow and render superfluous the acknowledged tribe exception under § 2719(b)(2)(B)(i). As a result, the State contends that the plain meaning of the restored lands exception precludes the exception being applied to a tribe that was acknowledged through the defined acknowledgment process.

■ A court is required to interpret statutes as a whole and avoid constructions that would render words or provisions superfluous or meaningless. *See Lyons,* 105 F.3d at 1069 (discussing need to give meaning to all terms) (implicit overruling on other grounds recognized in *Arredondo v. United States,* 120 F.3d 639 (6th Cir. 1997)). *See also* NORMAN J. SINGER, 2A SUTHERLAND STATUTES AND STATUTORY CONSTRUCTION § 46.06 (5th ed.1992). "[I]t is a 'fundamental principle of statutory construction (and, indeed, of language itself) that the meaning of a word cannot be determined in isolation, but must be drawn from the context in which it is used.'" *Textron Lycoming Reciprocating Engine Division, Avco Corp. v. United Automobile, Aerospace, Agricultural Implement Workers of America,* 523 U.S. 653, 657, 118 S.Ct. 1626, 140 L.Ed.2d 863 (1998) (quoting *Deal v. United States,* 508 U.S. 129, 132, 113 S.Ct. 1993, 124 L.Ed.2d 44 (1993)). *Accord Cohen v. de la Cruz,* 523 U.S. 213, 220–21, 118 S.Ct. 1212, 140 L.Ed.2d 341 (1998).

■ In the instant case, the State seeks not only to urge a secondary meaning over a primary one but also to impose a procedural limitation on all dictionary definitions of the word. However, in the absence of actual conflict with surrounding terms, courts are reluctant to infer a legislative intent to use a secondary definition over the primary definition, much less one that has an extraordinary and technical meaning as a term of art. *See Muscarello v. United States,* 524 U.S. 125, 128–32, 118 S.Ct. 1911, 141 L.Ed.2d 111 (1998) (declining to use secondary definition of "carry" over primary definition in absence of clear legislative intent to do so).

Departure from the language of the legislature and resort to judicially created rules of statutory construction is appropriate only in the "rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters ... or when the statutory language is ambiguous." The plain meaning of the statute controls the court's interpretation in all other instances.

*Nixon,* 76 F.3d at 1386 (quoting *Kelley v. E.I DuPont de Nemours & Co.,* 17 F.3d 836, 842 (6th Cir.1994)). The State has failed to demonstrate that Congress intended to limit the restored-lands exception in the manner it suggests.

First, the State has failed to demonstrate that Congress consistently and exclusively used only the word "restore" when restoring Indian tribes through legislative action. Instead, Congress has used the words "restore" and "restoration" interchangeably with "reaffirm" and "recognize" in the course of its actions to restore recognition to previously recognized tribes. *See, e.g.,* Paiute Indian Tribe of Utah Restoration Act, Pub.L. No. 96–277, 94 Stat. 317 (1980) (codified at 25 U.S.C. §§ 761–768); Siletz Indian Tribe Restoration Act, Pub.L. No. 95–195, 91 Stat. 1415 (1977) (codified at 25 U.S.C. § 711). (*See also* P–20: Letter Opinion from Office of the Solicitor to Secretary of the Interior re Pokogon Band of Potowanami Indians at 3–7 (Sept. 19, 1997) (discussing interchangeable Congressional use of "restore," "reaffirm," "affirm" and "recognize"); P–21: Letter Opinion of Associate Solicitor to Secretary of Interior re Little Traverse Bay Band of Odawa Indians at 4–7 (Nov. 12, 1997) (same).) While in its post-trial brief the State has selectively pointed to

statutory titles containing the word "restoration," the State has failed to analyze the words used in any acts themselves or to dispute the references cited by plaintiff or the Secretary. As a result, the State has failed to demonstrate a standard, accepted and exclusive Congressional use of the words "restore" and "restoration."

Congressional use of the words appears to have occurred in a descriptive sense only, in conjunction with action taken by Congress to accomplish a purpose consistent with the ordinary meaning of the words. In no sense has a proprietary use of "restore" or "restoration" been shown to have occurred. *Id.; see also TOMAC*, 193 F.Supp.2d at 193–94; *Confederated Tribes*, 116 F.Supp.2d at 163–64; *Sault Ste. Marie Tribe*, 78 F.Supp.2d at 705–07; *Grand Traverse Band*, 46 F.Supp.2d at 696–99. Moreover, even had Congress always used the terms "restore" and "restoration" when enacting legislation to accomplish the purpose of restoring a tribe, such evidence would not demonstrate that Congress intended to create a proprietary use of the word. The State has failed to identify any basis for concluding that Congress intended that the word "restore" as used in the IGRA should be limited by the words used by Congress in enacting statutes of restoration or that Congress intended to prohibit the use of the word "restore" when tribes used the acknowledgment process. See *Sault Ste Marie Tribe*, 78 F. Supp 2d at 706.

The court agrees with the State that the provision excepting lands acquired for restoration of lands for a restored tribe under subsection (b)(1)(B)(iii) must be distinguished in some fashion from the provision excepting lands acquired by way of acknowledgment of a tribe under subsection (b)(1)(B)(ii). However, no evidence exists that a distinction between the provisions may be recognized only by inferring a Congressional intent to create mutually exclusive categories by way of an extraordinary but unspecified definition of the terms.

Instead, applying the common definitions of the terms "restore" and "restoration" to the statute, subsection (b)(1)(B)(iii) does not swallow the interpretation of subsection (b)(1)(B)(ii). Both of the exceptions appear to be intended to place tribes that are belatedly acknowledged or restored in the same or similar position as tribes recognized by the United States earlier in their history. The statute expressly provides that lands located within or contiguous to the tribe's reservation on the effective date of the IGRA are exempt from the procedures of § 2719(b). See 25 U.S.C. § 2719(a)(1). Tribes which are belatedly recognized or acknowledged, however, have not had the ability to have lands placed in trust by the Secretary for the purpose of establishing or preserving a reservation. As a result, the statute appears to allow belatedly recognized tribes to have lands exempted by way of certain other exceptions.

Use of the federal acknowledgment process referenced under subsection (b)(1)(B)(ii) is not limited to those tribes which previously had been recognized by the administrative agency and whose recognition was later taken away. Instead, the Secretary has authority to recognize tribes by virtue of a complex set of historical facts, which may or may not include prior express recognition by the United States and the Secretary. See 25 C.F.R. § 83.7 (setting forth criteria for federal acknowledgment).

When seeking acknowledgment, the Band required a land base, in accordance with 25 C.F.R. Part 54 (now codified at 25 C.F.R. Part 83). (Dkt # 64: Rastetter Aff. ¶ 5.) The non-profit corporation then-acting as the Band's governing body had obtained a 99–year lease from Leelanau

County, with option to renew, on 147.4 acres which the county held in trust for the benefit of the tribe. Following acknowledgment on May 27, 1980, the tribe was required to pursue a lawsuit against the prior trustee, the non-profit corporation that had moved for acknowledgment, in order to obtain control over these leased lands. That control was finally obtained by court order on January 30, 1985. (*Id.* at ¶¶ 6–7.) In the meantime, the Band acquired fee simple title to 12.5 acres, which was the total property acknowledged as the initial reservation of the tribe.

At the time the acknowledgment process was used by the Band in the instant case, however, the size and location of the initial reservation land had no extra-acknowledgment consequences. Fully eight years after the Band was acknowledged under the process, the IGRA created an exemption for lands initially acknowledged by the Secretary. The State's proposed interpretation of exclusivity would impose an additional, unanticipated consequence of having used the acknowledgment process rather than Congressional action for obtaining recognition—that the tribe would be limited under the IGRA to the first land taken into trust following acknowledgment.

Such a *post facto* consequence is unreasonable if Congress has not clearly expressed such an intent. I conclude that no such intent is apparent here. Instead, it is perfectly sensible that "acknowledged" and "restored" tribes may on occasion overlap. Acknowledgment is a specifically defined term under the IGRA, because the statute expressly references a federal administrative process, 25 C.F.R. Part 83, by which the agency acknowledges the historical existence of a tribe. In contrast, a tribe is "restored" when its prior recognition has been taken away and later restored. Those processes may overlap where, as in this case, the tribe was Congressionally

recognized, but later lost such recognition in some fashion. But not all tribes acknowledged under the federal acknowledgment process could also be described as restored. It is readily apparent that a tribe may be acknowledged which had never previously been recognized. *See* Aroostook Band of Micmacs, 137 CONG. REC. H9653 (1991); *see also* 25 C.F.R. §§ 83.7(a) and 83.8. Similarly, a tribe may be restored by way of legislative action rather than administrative action. Those tribes restored by way of legislative action are not eligible to exercise the initial acknowledgment provision. The fact that a subset of tribes like the Band might conduct gaming under both the initial-reservation and on restored-lands clauses does not render one provision or another superfluous.

Further, I note that the State's suggestion that the exceptions are mutually exclusive is at odds with the previously unmentioned third exception of § 2719(b)(1)(B). Subsection (b)(1)(B)(i) excepts from § 2719 those lands taken into trust as part of "a settlement of a land claim." If, as the State asserts, the exceptions were intended by Congress to be mutually exclusive, a tribe acknowledged by the Secretary which subsequently settled a land claim implicitly would be barred from asserting the exception of subsection (b)(1)(B)(i), despite the unequivocal and unrestricted language of the subsection excepting lands taken into trust as part of "a settlement of a land claim."

In sum, I conclude that the words "acknowledged" and "restored" are separate and have spheres of independent meaning, but may nonetheless overlap in some instances. Giving ordinary meaning to the words used by Congress does not render any portion of the statute mere surplusage. *See Bailey v. United States,* 516 U.S. 137, 145, 116 S.Ct. 501, 133 L.Ed.2d 472

(1995) (reiterating that statutes should be construed so as to avoid rendering language mere surplusage); *Platt v. Union Pacific Railroad Co.*, 99 U.S. 48, 58, 9 Otto 48, 25 L.Ed. 424 (1878) (same). Absolutely nothing in the statute suggests that Congress prohibited such a result and the statute is perfectly harmonious without this court imposing a specialized meaning on any term. *See Hartford*, 530 U.S. at 6, 120 S.Ct. 1942 (unless result is absurd or other intent is clearly expressed, ordinary meaning is conclusive).[2]

The State next argues that the intent of the IGRA was to limit the proliferation of casinos. As a result, it asserts, all exceptions to the statute should be read narrowly.

The State cites no authority to support its claimed purpose for the IGRA. Indeed, Congress' stated purposes do not even include the State's suggested purpose:

The purpose of this chapter is—

(1) to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments;

(2) to provide a statutory basis for the regulation of gaming by an Indian tribe adequate to shield it from organized crime and other corrupting influences, to ensure that the Indian tribe is the primary beneficiary of the gaming operation, and to assure that gaming is con-

ducted fairly and honestly by both the operator and players; and

(3) to declare that the establishment of independent Federal regulatory authority for gaming on Indian lands, the establishment of Federal standards for gaming on Indian lands, and the establishment of a National Indian Gaming Commission are necessary to meet congressional concerns regarding gaming and to protect such gaming as a means of generating tribal revenue.

25 U.S.C. § 2702. As Congress clearly stated, the purpose of the IGRA was not to limit the proliferation of Indian gaming facilities. Instead, it was to provide express statutory authority for the operation of such tribal gaming facilities as a means of promoting tribal economic development, and to provide regulatory protections for tribal interests in the conduct of such gaming. *See, e.g., Diamond Game Enter., Inc. v. Reno*, 230 F.3d 365, 366–67 (D.C.Cir. 2000); *United States v. 103 Electronic Gambling Devices*, 223 F.3d 1091, 1094 (9th Cir.2000); *United States v. Cook*, 922 F.2d 1026, 1033 (2d Cir.1991). The clearly defined purpose of the statute creates no basis for presuming that Congress intended to narrow the right to game except where that intent is clearly stated. *See California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 218–19, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1987) (recognizing tribal authority to game without state reg-

---

**2.** I therefore disagree with the NIGC's application of the rules of statutory construction to find that the restored-lands clause is ambiguous. The NIGC determined that the fact that Congress had often used the words "restore" and "restoration" when enacting legislation to *restore* recognition to previously recognized tribes provided "some evidence" that the words used in the IGRA constituted a term of art. As a result, the NIGC concluded that the restored-lands clause should be considered ambiguous. However, Congress is presumed to intend that words used in a statute will have their ordinary meaning. "[A]bsent a clearly demonstrated legislative intention to the contrary, that language must ordinarily be regarded as conclusive." *Patterson*, 456 U.S. at 68, 102 S.Ct. 1534. Here, no such contrary intent is demonstrated and the NIGC made no finding of a clearly demonstrated legislative intent to use a term-of-art. As a result, the statute cannot be considered ambiguous and the plain meaning must be applied. The court therefore rejects the NIGC's finding of ambiguity.

ulation). As a result, the chronological limitation on the ability of tribes to game must itself be deemed an exception to the grant of general authority to game and the stated purpose to authorize gaming as a method of promoting tribal economic development and self-sufficiency. *See Menominee Tribe of Indians v. United States,* 391 U.S. 404, 413, 88 S.Ct. 1705, 20 L.Ed.2d 697 (1968) (requiring clear evidence of congressional intent to limit tribal rights).

■ In sum, the undisputed history of the Band's treaties with the United States and its prior relationship to the Secretary and the BIA demonstrates that the Band was recognized and treated with by the United States. Both prior to and after such treaties, until 1872, the Band was dealt with by the Secretary as a recognized tribe. Only in 1872 was that relationship administratively terminated by the BIA. This history—of recognition by Congress through treaties (and historical administration by the Secretary), subsequent withdrawal of recognition, and yet later reacknowledgment by the Secretary—fits squarely within the dictionary definitions of "restore" and is reasonably construed as a process of restoration of tribal recognition. The plain language of subsection (b)(1)(B)(iii) therefore suggests that this Band is restored.

I find no evidence of Congressional intent to establish mutually exclusive categories of exceptions under § 2719(b)(1)(B). I further find no basis for giving the terms "restored" and "restoration," as used in § 2719, anything other than their ordinary meanings. As a result, I find no basis in the language of § 2719 for adopting the State's specialized definition of the terms.

■ Moreover, even if the State's definition could be considered plausible, a conclusion I reject, the Band's construction of the statute is more plausible. The existence of a plausible construction more favorable to the Band must be given preference under principles of statutory construction as applied to statutes addressing Indians and the historic trust position of the United States. *See Bryan v. Itasca County,* 426 U.S. 373, 96 S.Ct. 2102, 48 L.Ed.2d 710 (1976) (stating canon of construction that ambiguities in statutes dealing with Indians should be construed in a manner that benefits the Indians).[3]

### 2. Whether the acquisition of Turtle Creek is part of a "restoration of lands."

Having concluded that the Band may be considered a restored tribe under the statute, the question remains whether the land at issue was "taken into trust as part of ... the restoration of lands for an Indian tribe that is restored to Federal recognition." The State contends that in order to be "part of ... the restoration of lands" to a restored tribe, some limitation is required beyond the simple language of the exception. Otherwise, the State asserts, restored tribes will be placed in a comparatively advantaged position vis-a-vis tribes which were not restored, because all acquisitions of property subsequent to restoration will be excepted from the statute. The State argues that the proper and only way to limit the clause is to require that Congress have taken action to restore the land.

---

**3.** The State asserts the unexceptional proposition that "a canon of construction is not a license to disregard clear expressions of ... congressional intent...." *DeCoteau v. District County Court,* 420 U.S. 425, 447, 95 S.Ct. 1082, 43 L.Ed.2d 300 (1975). This court,

however, does not rely on the canon to override clearly expressed congressional intent. Instead, the court merely notes that the canon is consistent with the expressed congressional intent contained in the plain meaning of the terms.

However, accepting the State's position that some limitation is required, nothing in the record supports the requirement of Congressional action. Neither the statute nor the statutory history suggests such a limitation. Given the plain meaning of the language, the term "restoration" may be read in numerous ways to place belatedly restored tribes in a comparable position to earlier recognized tribes while simultaneously limiting after-acquired property in some fashion. For example, land that could be considered part of such restoration might appropriately be limited by the factual circumstances of the acquisition, the location of the acquisition, or the temporal relationship of the acquisition to the tribal restoration.

Upon review of each of these factors, the NIGC determined that the Turtle Creek site was acquired as part of a restoration of lands to a restored tribe. (P–23.) The NIGC concluded that the historical evidence demonstrated that the Band acquired the property as part of its "earliest attempts to build a reservation." (*Id.* at 16.) The NIGC further found that the Band viewed the site as part of its core land area. (*Id.*)

Further, opinions from the Office of the Solicitor to the Secretary of the Interior support a conclusion that the Grand Tra- verse Band's acquisition of the Turtle Creek site amounts to a restoration of land. In two opinions, the Solicitor considered lands taken into trust following the reaffirmation of the Pokogon Band of Potawanami Indians and the Little Traverse Bay Band of Odawa Indians. (P–20; P–21.) Both bands had an essentially identical history to the Grand Traverse Band, and the Solicitor found that after-acquired lands were restored lands within the meaning of § 2719. Having concluded that the tribes were restored, the Solicitor took a broad view of what constituted lands taken into trust as part of a restoration of lands within the meaning of § 2719(b)(1)(B)(iii). The Solicitor concluded that the lands at issue were part of a restoration simply on the basis that the lands at issue were within the twenty-county area ceded by the tribe to the United States.[4]

By the reasoning contained in the Solicitor's opinions, if a tribe is a restored tribe under the statute, any lands taken into trust that are located within the areas historically occupied by the tribes are properly considered to be lands taken into trust as part of the restoration of lands under § 2719. In other words, the solicitor's opinions reject the State's assertion that it is improper to adopt a chronologically open-ended interpretation of what

**4.** As I previously have discussed, the State contends that these tribes are distinguishable from the Grand Traverse Band on the basis that they were "restored" by Congress rather than by the Secretary in the acknowledgment process. I previously have concluded that the government's asserted distinction is not supportable on the language of the statute. I note in passing that the Solicitor's opinions regarding the Pokogon Band of Potawanami Indians and the Little Traverse Bay Band of Odawa Indians analyze whether a tribe is restored *not* by the specific language used by Congress, but by what historically occurred. The common thread among all these cases is that, before their enactment, the tribe was not included on the list of Federally Recognized Tribes published annually in the Federal Register. Inclusion on the list is a prerequisite to acknowledgment that the tribe has "the immunities and privileges available to other federally acknowledged Indian tribes by virtue of their government-to-government relationship to the United States as well as the responsibilities, powers, limitations and obligations of such tribes." 61 Fed.Reg. 58,211 (Nov.1996). The NIGC also has accepted this analysis. (P–23 at 18 n. 14.) The Solicitor's analysis, therefore, is consistent with my own regarding the meaning of what constitutes a "restored tribe."

constitutes a restoration of lands under § 2719. Further, in light of the virtually identical history of these tribes with the Grand Traverse Band, reliance on the Solicitor's analysis is particularly appropriate. Treating similarly situated tribes in a similar manner is consistent with federal legislation that counsels against interpretations that distinguish among tribes in ambiguous circumstances. *See* 25 U.S.C. § 476(f) ("Departments of agencies of the United States shall not promulgate any regulation or make any decision or determination pursuant to the Act of June 18, 1934 (25 U.S.C. 461 et seq., 48 Stat, 984) as amended, or any other Act of Congress, with respect to a federally recognized Indian tribe that classifies, enhances, or diminishes the privileges and immunities available to the Indian tribe relative to other federally recognized tribes by virtue of their status as Indian tribes.") *See also* P–23 at 14.

In addition, I note that the language of subsection (b)(1)(B)(iii) does not contain the same limiting language of subsection (b)(1)(B)(ii), which restricts the (B)(ii) exception to only those lands forming part of the "initial" reservation. Instead, the (B)(iii) exception requires only that the lands in issue to be part of "the restoration of lands for an Indian tribe that is restored to Federal recognition." That languages implies a process rather than a specific transaction, and most assuredly does not limit restoration to a single event.

The Band does not claim that any lands which are taken into trust for a restored tribe necessarily amount to a restoration of lands under § 2719(b)(1)(B)(iii). It contends instead that in order to meet the requirements of the exception, the land must in some sense be said to be "restored."

Here, it is undisputed that the Turtle Creek site lies within the counties previously ceded by the Band to the United States. Indeed, the site is only 1.5 miles from the edge of the 1836 reservation assigned to the Band. Further, the Band's evidence clearly established that the parcel was of historic, economic and cultural significance to the Band. The State provided no contrary evidence. Instead, State experts merely opined that other locations also were of historical significance and arguably were more important to the Band. That fact, however, even if true, does not undermine the evidence of historical significance. The site therefore may be reasonably considered to be part of a restoration of lands in an historic, archeologic and geographic sense.

Second, the evidence supports the conclusion that at the time of its acquisition, the parcel was intended to be part of a restoration of tribal lands. (Tr. II Kewaygoshkum 9; Tr. II Petoskey 30; P–25 at 10–11, 66–67; Dkt # 64: Supp. Aff. of William Rastetter at ¶¶ 8–11.) The Turtle Creek property was part of the very earliest attempts to build a reservation by the newly acknowledged Band following ratification of its constitution. *Id.*

Finally, the land may be considered part of a restoration of lands on the basis of timing alone. Other than the leased land, which came to the Band's use in 1985, and title to the 12.5 acres, which was taken into trust in 1984, the Band did not acquire any additional lands in trust until 1988. (P–23 at 16.) The Secretary would not take land into trust on behalf of the Band until its constitution had been approved. The Band's constitution was not approved by the Secretary until March 1988. Between March 1988 and July 1990, the Band took into trust all of the multiple parcels of property currently held in the reservation. The subject property was taken into trust on August 8, 1989. As a matter of timing, the acquisition of the Turtle Creek site was part of the first systematic effort to restore tribal lands.

■ For all these reasons, I conclude that the Turtle Creek site was acquired as part of a restoration of lands to a restored tribe. The Band has introduced substantial and uncontradicted evidence that the parcel is located in an area of historical and cultural significance to the Band that was previously ceded to the United States. The Band also has introduced uncontradicted evidence of the intent of the Band in acquiring properties between 1988 and 1990. Finally, it has introduced evidence supporting the temporal proximity of restoration of all reservation holdings to the time of acknowledgment and approval of the tribal constitution, together with the absence of any substantial restoration of lands preceding the property at issue.

I therefore determine that the land is subject to the restored-lands exception to the general prohibition of gaming on lands acquired after October 1988.

### B. *Tribal–State Compact*

In its cross-complaint, the State asserts that gaming on the Turtle Creek site is barred by section 2(C) of the tribal-state compact between the Band and the State. Section 2(C) provides:

> Notwithstanding subsection 2(B) above, any lands which the Tribe proposes to be taken into trust by the United States for purposes of locating a gaming establishment thereon shall be subject to the Governor's concurrence power, pursuant

to 25 U.S.C. § 2719 or any successor provision of law.

(J–5 at 3.)

■ Under Michigan law, " '[t]he primary goal in the construction of interpretation of any contract is to honor the intent of the parties.' " *Sault Ste. Marie Tribe of Chippewa Indians v. Engler* ("*Engler II*"), 271 F.3d 235, 237–38 (6th Cir.2001). *See also Sault Ste. Marie Tribe of Chippewa Indians v. Engler* ("*Engler I*"), 146 F.3d 367, 372 (6th Cir.1998). The court " 'look[s] for the intent of the parties in the words used in the instrument....' " *Engler II*, 271 F.3d at 238 (quoting *Michigan Chandelier Co. v. Morse*, 297 Mich. 41, 297 N.W. 64, 67 (1941)). Where the terms of the contract are clear and unambiguous, those terms are dispositive of the parties' intent. *Engler I*, 146 F.3d at 373; *Michigan Chandelier*, 297 N.W. at 67; *UAW– GM Human Resource Center v. KSL Recreation Corp.*, 228 Mich.App. 486, 579 N.W.2d 411, 414 (Mich.App.1998). Where terms are ambiguous, however, the court may look to extrinsic evidence in determining the parties' intent. *Engler I*, 146 F.3d at 373.

The State argues that the plain language of the compact term requires the Governor to concur before gaming is permitted on any land taken into trust by the United States after 1988. The State asserts that the language is unambiguous and provides no exceptions. The State therefore contends that the court should decline to look at extrinsic evidence of the parties' intent.[5]

---

5. The court notes that the State took a schizophrenic position on extrinsic evidence at trial. The State called Michael Gadola, the Governor's chief negotiator, as a witness in its case in chief. The State questioned Mr. Gadola extensively regarding the Governor's intent in conducting compact negotiations and in adding section 2(C). The State, however, contended that the Band should be barred from introducing responsive evidence to the effect that the parties never intended the concurrence power to extend to the restored-lands excep-

tion. Specifically, the State contended that because the parties agreed that neither party had discussed the restored-lands exception, evidence of the parties intent regarding that provision was inadmissible.

The court admitted all evidence of intent so as to compile a full record for decision. As previously stated, the court finds the language unambiguous, and therefore does not rely on parol evidence to reach a determination. The court nevertheless rejects the State's narrow

The Band also asserts that the compact term is unambiguous. The Band contends, however, that the term does no more than make it clear that the parties intended to preserve the Governor's power as it exists under the IGRA. In the alternative, the Band argues that if the court should find the provision ambiguous, the parties clearly intended only to preserve the Governor's power as set forth in the IGRA.

I agree that the provision is unambiguous. The language of 2(C) specifically and expressly invokes and incorporates the Governor's concurrence power under the IGRA. The term states that the Governor retains his concurrence power "pursuant to 25 U.S.C. § 2719."

The term "pursuant to" has a well-established meaning, and is defined as:

> in the course of carrying out: in conformance to or agreement with: according to.

WEBSTER'S THIRD NEW INT'L DICTIONARY 1848 (G. & C. Merriam Co.1976). Applying that definition to section 2(C) of the compact, the provision may be read as stating that gaming on after-acquired lands is "subject to the Governor's concurrence power, ['according to'] 25 U.S.C. § 2719." No other concurrence power is intimated in the compact language other than that provided under § 2719 or its successor provision under law.

In turn, § 2719 provides the Governor power to concur with a best interest determination made by the Secretary only under § 2719(b)(1)(A). No best interest determination is required and no concurrence power is granted to the Governor for the remaining exceptions to the prohibition on gaming on lands acquired after

1988:(1) § 2719(a)(1) (exception for lands within or contiguous to tribe's reservation boundaries); (2) § 2719(a)(2)(B) (last-recognized-reservation exception); (3) § 2719(b)(1)(B)(i) (exception for settlement of a land claim); (4) § 2719(b)(1)(B)(ii) (exception for initial reservation of acknowledged tribe); or (5) § 2719(b)(1)(B)(iii) (restored-lands exception). As a result, the language section 2(C) of the compact does not grant the Governor concurrence power with respect to any exception under § 2719 other than § 2719(b)(1)(A).

Indeed, the State makes no serious argument to support its assertion that the agreement grants absolute concurrence power. The State includes no discussion of the language except to say that "[t]he gubernatorial concurrence called for by this language is unequivocal and unqualified." The State fails entirely to discuss the meaning of the phrase "pursuant to 25 U.S.C. § 2719 or any successor provision of law." Instead, the State implicitly reads out of existence this defining language.

The State suggests, however, that to view the compact term as merely reiterating the Governor's rights under 25 U.S.C. § 2719 renders the provision redundant, in violation of a cardinal rule of construction requiring that each "word, clause and paragraph of a contract ... be given meaning and effect if possible." *Roy Annett, Inc. v. Killin,* 365 Mich. 389, 393, 112 N.W.2d 497 (1961). However, section 2(C) of the compact does not render any other provision of the compact surplusage and is not itself superfluous vis-a-vis any other contractual provision.

construction of the parol evidence rule. Were the language ambiguous, parol evidence that neither party affirmatively contemplated or intended to expand the Governor's veto power to cover lands within the restored-lands provision of the IGRA clearly would be relevant to a determination of the parties' intent in drafting the provision. In other words, under the circumstances, the lack of such intent is equally relevant as would be the presence of such intent.

■ Instead, the provision is arguably unnecessary only because it reiterates and expressly incorporates a statute. Because the statutory right exists, it is doubtful that the compact could be construed to circumvent 25 U.S.C. § 2719. In fact, courts routinely have recognized "the general rule that statutes relating to the subject matter of a contract and existing at the time of the execution of such contract become a part thereof and must be read into the contract, except when a contrary intention appears." *Brotherhood of Ry. & S.S. Clerks, Freight Handlers, Exp. & Station Emp. v. Railway Express Agency, Inc.*, 238 F.2d 181, 184 (6th Cir.1956). *See also Norfolk & Western Ry. Co. v. American Train Dispatchers Ass'n*, 499 U.S. 117, 129–30, 111 S.Ct. 1156, 113 L.Ed.2d 95 (1991) ("Laws which subsist at the time and place of the making of a contract, and where it is to be performed, enter into and form a part of it, as fully as if they had been expressly referred to or incorporated into its terms.").

Here, because the Governor was concerned the compact might be construed to undermine his statutory authority, section 2(C) was added to expressly preserve that authority. The fact that a contract term may, through an excess of caution, be redundant of statutory rights does not violate any principle of statutory construction. Indeed, as the courts have recognized, contracting parties routinely reference applicable law. *See, e.g., Railway Express*, 238 F.2d at 184 (holding that the contracting parties' use of the phrase "pursuant to" not only failed to evince an intent contrary to the general rule of incorporation, but also demonstrated that the parties intended the workers' powers to be read "in conformity to" the cited statute). The State provides no authority for the proposition that contracts must be construed so as not to incorporate statutory rights.

■ I therefore conclude that, on its face, section 2(C) of the tribal-state compact does not require the concurrence of the Governor in gaming on "lands taken into trust as part of ... the restoration of lands for an Indian tribe that is restored to Federal recognition."

While the court's conclusion that the provision is unambiguous precludes consideration of extrinsic evidence of a contrary intent, Michigan law has consistently recognized that extrinsic evidence which is consistent with the language of the agreement is always admissible. *See Union Oil Co. v. Newton*, 397 Mich. 486, 245 N.W.2d 11 (1976).

In the instant case, the plain meaning of the language is fully consistent with all of the trial evidence. Indeed, the State presented no evidence that either the Governor or the negotiating tribes intended section 2(C) of the compact to expand the Governor's powers under § 2719. All of the lead negotiators for the parties, including the deputy legal counsel to the Governor, Michael Gadola, testified that section 2(C) was not intended to expand the Governor's rights. (Tr. II Gadola 60–61; Tr. III Peebles 67; Greene dep. at 15.) In addition, then vice chairperson of the Band, Eva Petoskey, testified concerning the Band's understanding of the compact. (Tr. III Petoskey 83.) Further, Michael Gadola testified that he understood at the time of contracting that § 2719 contained exceptions over which the Governor had no concurrence power, such as the contiguous lands provision, § 2719(a)(1), and the exception for settlement of a land claim, § 2719(b)(1)(B)(i). Gadola specifically testified that section 2(C) was added to make it clear that the compact was not taking away from the Governor's powers under § 2719. (Tr. III Gadola 33–34, 37 ("What I recall is the Governor, again, being very jealous of his veto power under Section

2719 and not wanting to suggest any diminution in that veto authority.").) [6]

In sum, both the plain meaning of the compact language and the extrinsic evidence of the parties' intent support a conclusion that the Governor's concurrence power under the compact is identical to his power under § 2719. Under § 2719, the Governor possesses no concurrence power with respect to the restored-lands exception. Accordingly, the Band is entitled to judgment on the State's compact claim.

## IV. CONCLUSION

For the foregoing reasons, I conclude that gaming is permissible at the Turtle Creek site pursuant to 25 U.S.C. § 2719(b)(1)(B)(iii). Accordingly, the Band is entitled to judgment in its favor on its complaint. Further, the Band is entitled to judgment in its favor on the State's cross-complaint.

## ORDER AND JUDGMENT

This action having come on for trial before this court, and the issues having been tried, and in accordance with the opinion filed this date,

**IT IS ORDERED** that judgment is entered in favor of Grand Traverse Band of Ottawa and Chippewa Indians and against the State of Michigan.

**IT IS FURTHER ORDERED** that the within case is hereby dismissed with prejudice. Costs may be taxed as provided by law.

---

**6.** The State suggests that at the time of contracting, it considered the Band to be an acknowledged tribe and therefore did not believe that the Band would be able to make a claim under the restored-lands exception. Regardless of the truth of this claim, the State's misunderstanding is irrelevant to the interpretation of the compact provisions. First, such evidence, to the extent it reflects the State's intent in compacting, is not admissible to prove an intent inconsistent with the plain language of the compact. Second, the State's misunderstanding of the meaning of a federal statute is a risk all parties undertook in compacting under the backdrop of federal law. The State may not disavow a contract

simply because it reached a legal conclusion about the state of the law that ultimately was unfounded. Finally, it is not at all apparent that the Governor could have refused to enter into a compact with the Band because it refused to abandon its rights under the IGRA. *See* 25 U.S.C. §§ 2710(3)(A) and (C) (requiring states to negotiate in good faith and setting forth the possible topics of negotiation) and § 2710(7)(B)(iii) (providing considerations for determining State's good faith in negotiation). Expansion of the Governor's veto powers under the IGRA is simply not a permissible topic of compact negotiation under the IGRA. *See* 25 U.S.C. § 2710(3)(C).